**David Leroy WASHINGTON,
Petitioner-Appellant,**

v.

**Charles E. STRICKLAND, Superintendent, Florida State Prison, and Jim Smith, Attorney General of the State of Florida, Respondents-Appellees.**

No. 81-5379.

United States Court of Appeals,
Fifth Circuit.*
Unit B

April 23, 1982.
Rehearing en banc ordered May 14, 1982.
See 679 F.2d 23.

---

\* Former Fifth Circuit case, Section 9(1) of Public Law 96 452—October 14, 1980.

Richard E. Shapiro, New Orleans, La., for petitioner-appellant.

Calvin Fox, Asst. Atty. Gen., Miami, Fla., for respondents-appellees.

Before RONEY, VANCE and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

In this appeal from the denial of a writ of habeas corpus, we are required to apply to a habeas petition claiming ineffective assistance of counsel at the sentencing phase of a prosecution for a capital crime the method of analysis and standards which have been developed in this circuit for habeas petitions based upon claims of ineffective assistance of counsel at the guilt phase of prosecutions for various crimes. Petitioner-Appellant, David Washington, voluntarily confessed and pleaded guilty to three brutal murders and to a lengthy series of associated crimes of violence; he makes no challenge to the validity of his confessions or pleas. Washington's death sentences have been affirmed by the Supreme Court of Florida on direct appeal. His claim of ineffective assistance of counsel at the sentencing phase of his prosecution has been rejected by a Florida circuit court, the Supreme Court of Florida and the federal district court below. In each case, the claim has been rejected in large part because the court concluded, un-

der the standards set out by the Supreme Court of Florida in *Knight v. State,* 394 So.2d 997 (Fla.1981), and by the Court of Appeals for the District of Columbia Circuit in *United States v. DeCoster,* 624 F.2d 196 (D.C.Cir.) (plurality opinion), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979), that Washington had failed to show that if his counsel had done all of the things that Washington claimed he had failed to do, the outcome of the sentencing phase would have been different, and that Washington had therefore failed to establish that he was denied the effective assistance of counsel.

We conclude that the district court employed a method of analysis of Washington's ineffective assistance of counsel claim that is different in material respects from that employed in this circuit. We therefore vacate this aspect of the judgment of the district court and remand for reconsideration in the light of this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND TO THIS APPEAL

### A. *Proceedings in the State Courts*

In a ten-day crime spree in September 1976, David Washington committed three murders, as well as a number of associated crimes of lesser gravity. He surrendered to police investigating one of these murders on October 1, 1976. On October 7, Washington was indicted in the Circuit Court for the Eleventh Judicial District, Dade County, Florida, for several offenses—including first degree murder—arising from the death of Frank Meli. On that same day, William Tunkey, an experienced criminal lawyer, was appointed to represent Washington on these charges, and immediately began preparations for trial. Against the advice of Tunkey, Washington confessed on November 5, 1976, to having murdered Daniel Pridgen and Katrina Burk in two separate incidents; additional indictments were filed for these and associated crimes on November 17. On December 1, 1976, Washington pleaded guilty—against the advice of counsel—to each of these three charges of first degree murder and associated crimes, and waived his right to a jury at the sentencing hearing.

Tunkey represented Washington at the sentencing hearing on December 6, 1976, before Judge Richard F. Fuller. At the sentencing hearing, the State called numerous witnesses who testified about the details of the three murders and the associated crimes. Their testimony was based in some cases on first hand observation of the crime or crime scene and in some cases on detailed oral and written statements that Washington had voluntarily given to them. The defense elected to offer no testimony, but instead adopted the testimony that Washington had given at the proceeding at which he pleaded guilty. That testimony, in turn, contained numerous statements by Washington acknowledging his guilt. He also testified during the guilty pleas colloquy about the emotional pressure that he was under at the time of the crimes as a result of his prolonged unemployment and the acute financial needs of his wife and young children, about the fact that he had committed, in recent months, a series of robberies to obtain money for his family and about his lack of prior arrests until a few months before the murders. In Tunkey's closing argument, he stressed in mitigation the fact that Washington had admitted his guilt. At the conclusion of the sentencing phase, Judge Fuller sentenced Washington to death on each count of first degree murder and to consecutive terms of imprisonment on the other charges.

On September 7, 1978, the Florida Supreme Court, on direct appeal, affirmed Washington's convictions and death sentences. *Washington v. State,* 362 So.2d 658 (Fla.1978), *cert. denied,* 441 U.S. 937, 99 S.Ct. 2063, 60 L.Ed.2d 666 (1979). After discussing at some length the circumstances surrounding Washington's crimes, *id.* at 660–64, the court found no merit in Washington's argument that the death penalty was unconstitutional per se. *Id.* at 665. It also rejected Washington's argument that the sentencing court had impermissibly found and considered certain aggravating factors and that the court had erred in failing to find and consider certain mitigating circumstances. *Id.* at 665–67.

In early September 1980, Washington filed written motions for post-conviction re-

lief in the state circuit court pursuant to Fla.R.Crim.P. 3.850. These motions were denied without prejudice on October 2, 1980, *nunc pro tunc* to September 23, 1980, because Washington had failed to verify them properly. On September 12, 1980, Washington appeared through counsel at clemency proceedings before the Governor of Florida; on March 13, 1981, however, the Governor of Florida signed Washington's death warrant. Accordingly, on March 19, Washington filed properly verified motions for post-conviction relief in the state circuit court. That court denied relief on March 25 without holding an evidentiary hearing on Washington's factual allegations.

■ The Florida Supreme Court affirmed the circuit court's action in a written opinion issued on April 6, 1981. *Washington v. State*, 397 So.2d 285 (Fla.1981). With respect to the "most critical" of Washington's attacks on his sentences—an ineffective assistance of trial counsel claim—the court concluded that under the standards set out in *Knight v. State*, 394 So.2d 997 (Fla.1981),[1] Washington's allegations of ineffective assistance of counsel were "shown conclusively to be without merit so as to obviate the need for an evidentiary hearing." *Washington v. State, supra,* 397 So.2d at 286. This was so, according to the court, because Washington had "failed under the *Knight* criteria to make a prima facie showing of substantial prejudice and ha[d] failed to such degree that [the court] believe[d], to the point of a moral certainty, that he is entitled to no relief under [Fla.R. Crim.P.] 3.850." *Id.* at 287. The court reached the same conclusion with respect to Washington's claim that he received ineffective assistance of appellate counsel. Finally, with respect to "fourteen asserted trial court errors or constitutional defects ranging from the court's failure to request a pre-sentence investigation to a multitude of oft-repeated constitutional challenges to Florida's death penalty statute," the court found that "[m]any of the issues have been conclusively decided adversely to [Washington's] position." *Id.* The balance of these arguments, according to the court, were "either without merit or have been waived." *Id.*

## B. Proceedings in Federal District Court

Having exhausted his state-court remedies, Washington immediately sought a writ

1. In *Knight*, the Florida Supreme Court drew heavily upon Judge Leventhal's plurality opinion in *United States v. DeCoster*, 624 F.2d 196 (D.C.Cir.) (en banc), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979) (see note 16 *infra*), in setting out the following four-step analysis for ineffective assistance of counsel claims:

> First, the specific omission or overt act upon which the claim of ineffective assistance is based must be detailed in the appropriate pleading.
> Second, the defendant has the burden to show that this specific omission or overt act was a substantial and serious deficiency measurably below that of competent counsel.... We recognize that in applying this standard, death penalty cases are different, and consequently the performance of counsel must be judged in light of these circumstances.
> Third, the defendant has the burden to show that this specific, serious deficiency, when considered under the circumstances of the individual case, was substantial enough to demonstrate a *prejudice to the defendant to the extent that there is a likelihood that the deficient conduct affected the outcome of the court proceedings.* In the case of appel-

late counsel, this means the deficiency must concern an issue which is error affecting the outcome, not simply harmless error....
> Fourth, in the event a defendant does show a substantial deficiency and presents a prima facie showing of prejudice, the state still has an opportunity to rebut these assertions by showing beyond a reasonable doubt that there was no prejudice in fact. This opportunity to rebut applies even if a constitutional violation has been established.
394 So.2d at 1001 (citation omitted) (emphasis added).
The State suggests that the Florida state courts' rejection of Washington's ineffective assistance claim is entitled to a presumption of validity under 28 U.S.C. § 2254(d) (1976). The contention, however, is completely rebutted by such cases as *Harris v. Oliver*, 645 F.2d 327, 330 n.3 (5th Cir. 1981), and *Mason v. Balcom*, 531 F.2d 717, 721–23 (5th Cir. 1976), which hold that because the question whether a defendant has received effective assistance is a mixed question of fact and law, § 2254(d) is inapplicable. Insofar as the state courts' rulings can be said to reflect subsidiary findings of basic, historical fact, those findings are undisputed.

of habeas corpus under 28 U.S.C. § 2254 (1976) in the court below. In what he described as the "centerpiece" of his attack on the constitutionality of his death sentences, Washington contended that his counsel in the sentencing proceedings,[2] William Tunkey, was constitutionally ineffective in the following respects:

(i) he failed to obtain or request from the trial court a psychiatric or psychological evaluation of Washington to determine whether there were any statutory or nonstatutory mitigating factors in his mental state at the time of the crimes;

(ii) he failed to investigate properly or present at the sentencing hearing readily available witnesses who would have given favorable testimony relating to Washington's character and background;

(iii) he failed to request from the trial court a presentence investigation even though there was nothing in the record about Washington's background when he was sentenced;

(iv) he failed to present a meaningful and factually supported closing argument and sentencing memorandum to the trial judge; and

(v) he failed to secure an independent evaluation of the reports of the medical examiners.

Washington contends that as a result of Tunkey's failure to investigate Washington's character, background and psychological condition at the time of the crimes, the sentencing judge was deprived of independent evidence which might have established the existence of two statutory mitigating circumstances—(1) that "[t]he capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance" (Fla.Stat. § 921.141(6)(b) (Supp.1981)) and (2) that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired" (Fla.Stat. § 921.141(6)(f) (Supp.1981))—as well as nonstatutory mitigating circumstances relating to his mental state at the time of the crimes (to the extent that it did not qualify as a statutory mitigating circumstance) and his background and character. Washington also urged that Tunkey had been constitutionally ineffective as appellate counsel in failing to challenge several irregularities at the sentencing proceedings and in raising no challenge to the trial judge's failure to obtain a presentence investigation. Additionally, Washington's habeas petition presented a number of legal challenges to the constitutionality of the Florida death penalty scheme, both on its face and as applied in Washington's case.[3]

**2.** Washington specifically declined to challenge Tunkey's effectiveness with respect to the entry of Washington's guilty pleas and his confessions of guilt; he does not contend that Tunkey failed to perform adequate investigation or to consult adequately with him about his confessions or guilty pleas. Neither is there any question but that Washington's confessions were freely and voluntarily given, and that his guilty pleas were informed and deliberate acts. All of Washington's grounds for habeas corpus relief relate solely to Tunkey's representation in Washington's sentencing proceedings and appeal therefrom, and to the propriety of the death sentence for Washington's crimes.

**3.** Taken somewhat out of order, Washington's specific additional arguments were as follows:

(1) that the Florida capital sentencing scheme precludes consideration of nonstatutory mitigating factors;

(2) that the trial judge interpreted the Florida sentencing scheme as precluding him from considering nonstatutory mitigating factors;

(3) that the trial judge's failure to obtain a presentencing report resulted in a sentencing decision so unreliable as to violate the Constitution;

(4) that the Florida death penalty statute unconstitutionally allows consideration of the fact that the crime was committed in conjunction with certain enumerated felonies as an aggravating factor, Fla.Stat. § 921.141(5)(d) (1975);

(5) that the Florida sentencing scheme leaves the manner in which aggravating and mitigating circumstances are to be weighed in the complete and undirected discretion of the sentencer;

(6) that the Florida sentencing scheme unconstitutionally requires the mitigating circumstances to outweigh the aggravating circumstances and thus requires imposition of the death penalty if the circumstances are in equipoise;

On April 7, 1981, the district court stayed Washington's scheduled execution; shortly thereafter, the court granted Washington's motion for an evidentiary hearing on the ineffective assistance of counsel issue. At the hearing on April 10–11, 1981, Tunkey testified at length. The substance of his testimony regarding his representation of Washington is as follows.

Following his appointment to represent Washington in the *Meli* case, Tunkey had a series of lengthy interviews with his client and promptly began pre-trial discovery and preparation of pre-trial motions. When, several weeks later, Washington confessed not only to the charges pending in the *Meli* case but also to two other murders, Tunkey was "shocked" and overcome with a "hopeless" feeling. Tunkey's testimony indicates that Washington's confessions and his decision to enter guilty pleas to the charges and waive a sentencing jury marked a significant turning point in Tunkey's representation of Washington. At the habeas hearing, Tunkey candidly stated that following these events, he did not feel "that there was anything which [he] could do which was going to save David Washington from his fate." In the weeks preceding the sentencing hearing, Tunkey in fact did very little in the way of investigation or preparation.

Although Tunkey spoke to Washington's mother and wife during this period, when they failed to keep appointments with him he did not actively attempt to seek them out or interview them with an eye toward obtaining background and character information or corroborating Washington's story about the pressures he was under as a result of his family's economic hardship. Tunkey made what he described as only "minimal" efforts to locate other prospective witnesses to testify on Washington's behalf. He did not interview any of Washington's former employers, nor did he speak to any of Washington's friends or neighbors in an effort to locate character witnesses.

From conversations with Washington, Tunkey received an impression of Washington as a "person who expressed very capably human emotions, who express[ed] grave concerns about the welfare of his family, of his wife, of his child...." Tunkey found "an absolutely inexplicable difference between the personality which I knew as compared to the crimes charged and the admissions which he made." Despite this sense of an "inexplicable difference" between the Washington he knew and the person who had committed these murders, Tunkey did not request a psychiat-

---

(7) that the Florida Supreme Court's construction of one aggravating circumstance (*i.e.*, that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody) is unconstitutionally broad and vague, Fla.Stat. § 921.141(6)(e) (1975);

(8) that the trial judge erroneously admitted highly inflammatory, duplicative, and prejudicial photographs into evidence in the sentencing proceedings;

(9) that the trial judge erroneously failed to apply the "beyond a reasonable doubt" standard in finding that several aggravating circumstances were present, and based his findings on impermissible nonstatutory aggravating circumstances;

(10) that the trial judge and the Florida Supreme Court's application of the "especially heinous, atrocious or cruel" statutory aggravating circumstance, Fla.Stat. § 921.141(5)(h) (Supp.1981), was both impermissibly broad and supported by insufficient evidence;

(11) that the trial judge and the Florida Supreme Court impermissibly restricted the scope of one statutory mitigating circumstance—a lack of a significant history of prior criminal activity, Fla.Stat. § 921.141(6)(a) (1975)—by construing it as having been negated by the defendant's admission that he had committed offenses that were not otherwise known to or confirmed by the prosecution;

(12) that with respect to one capital murder, the trial judge and the Florida Supreme Court erroneously applied two statutory aggravating circumstances, Fla.Stat. §§ 921.141(5)(d), (e) (1975), since in that murder the robbery was perpetrated after the murder and not while the defendant was engaged in the murder; and

(13) that the trial judge applied the wrong standard in weighing aggravating and mitigating factors, resulting in a "presumed" death sentence, since he stated at one point during the proceedings that his normal feeling in cases involving crimes of violence is to give the maximum sentence.

An additional claim was first raised in the course of the evidentiary hearing in the court below; see note 5, *infra*.

ric evaluation of Washington. Tunkey's testimony at the habeas hearing about why he did not request a psychiatric evaluation is conflicting. Tunkey initially testified that although he had considered the possibility of getting a psychiatric evaluation, he did not think that such an examination would be useful in understanding or explaining Washington's behavior. However, in his concluding testimony, Tunkey stated: "I did not think at the time to go ahead and utilize psychiatric or psychological experts to somehow demonstrate the overriding nature of the mitigating circumstances, I did not think of that." Additionally, although Tunkey acknowledged that, in the sentencing memorandum he submitted to the judge, he had argued that the court should consider, as a mitigating circumstance in Washington's case, the fact that "the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance," Tunkey testified that he did not think that the kind of testimony a psychiatrist might offer would be helpful in establishing this mitigating circumstance. Tunkey testified that he believed that Washington's own testimony at the guilty pleas colloquy adequately revealed that the crimes were prompted by Washington's despair over his family's dire financial straits and that psychiatric evidence was not likely to add anything helpful to Washington. Indeed, Tunkey testified that a psychiatric evaluation, even as it described Washington's emotional distress resulting from his family's hardship, might reinforce the evidence that Washington had committed the crimes in order to get money and might, therefore, do more harm than good.

With respect to his failure to request a presentence report, Tunkey testified that he did not think that such a report would have been helpful and feared that "it might establish facts more detrimental to my client than were already on the record if that is possible." Presumably Tunkey was referring not only to the facts in the record about the murders and associated crimes but also to the robberies committed by Washington during a period of several months before the murders in order to obtain money for his family, robberies which were described by Washington during the guilty pleas colloquy. However, Tunkey's testimony gives no indication as to what other damaging facts he feared a presentence report would reveal.

In summarizing his approach to the sentencing hearing, Tunkey reiterated the fact that following Washington's confessions and pleas he thought that his client's chances of escaping the death penalty were slim.

I really could find very little to address myself to in terms of a relevant, cogent presentation of mitigating circumstances as outlined by the statute itself and certainly insofar as aggravating circumstances are concerned, I did not feel exactly like I had sufficient ammunition to persuade anybody that the State was not going to succeed in showing at least that they outweighed the mitigating circumstances.

Under these circumstances Tunkey, drawing on his knowledge of the sentencing judge, whom Tunkey described as a person who "respected any individual who had been accused of a crime and who, in fact, was guilty of a crime who came before him and admitted his guilt," decided that at the sentencing hearing he would focus his argument on Washington's admissions of guilt and ask that his guilty pleas be considered as a mitigating factor. On the basis of this strategy, Tunkey's presentation of evidence at the sentencing phase consisted only of the transcript of Washington's testimony at the guilty pleas hearing.

The evidence introduced at the habeas hearing also included a number of affidavits given by Washington's friends, relatives, former employers and teachers. These affidavits consisted for the most part of statements describing David Washington as a responsible, non-violent young man who did not use drugs or alcohol, was active

in his church and devoted to his family.[4] All of the affiants stated that they would have willingly testified on Washington's behalf at the sentencing hearing but were never contacted by anyone involved in Washington's defense. The affidavits of two medical experts were also introduced at the habeas proceeding. These affidavits, although stating that Washington was not insane at the time he committed the murders, suggested that Washington's violent behavior resulted from the eruption of long suppressed feelings of self-hatred and anger generated by the physical abuse and unstable family situation Washington had known as a child, coupled with severe frustration, anxiety and depression concerning the financial problems of his family. Both of the doctors who interviewed Washington also reported that they found him remorseful.

■ At the habeas hearing, the State introduced into evidence a psychiatric evaluation of Washington made shortly after his arrest for the Meli murder by Dr. Sanford Jacobson, the Director of the Forensic Service at Jackson Memorial Hospital in Miami, pursuant to an order signed by a State judge. The Jacobson report quotes the defendant as stating that he had become involved in the Meli crimes because of his desire to obtain money and that he was becoming quite desperate as a result of his inability to obtain work. The report states that there was nothing in Washington's description of the events surrounding the Meli crimes which would indicate that he was suffering from any major mental illness at the time of the crimes. The report concludes:

> It is my opinion that presently the defendant is able to assist counsel in his defense and understand the nature of the charges against him. It is felt that the defendant possesses both a rational and factual understanding of the charges. It is further felt that the defendant at the time of the alleged offense had the substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law.

Tunkey testified that he could not recall whether he had seen the Jacobson report at

---

**4.** Washington's mother, grandmother and brother stated that he seemed, at the time of the crimes, to be under intense pressure from economic difficulties. His grandmother, Lulu Parham, stated that Washington often cried because of his inability to obtain a job to care for his family. He told her he didn't know what he was going to do. His mother, Julia Taylor, likewise recalled Washington's distress at being unemployed and recalled a specific instance where Washington had cried because he had no money for food or clothing for his family. Clarence Morgan, his brother, also recalled that Washington "wasn't his usual self" prior to the murders because of his inability to find a job.

Additional affidavits established that people who had known Washington for a number of years had considered him nonviolent and peaceable. A consistent theme running through the statements was the shock each person felt when Washington was arrested for murder. Theron Carson, president of the Greater New Bethel Baptist Church, stated that Washington sang in the church choir, was peaceable, non-violent, dependable and caring. He specifically stated that when he read of the murders: "I couldn't believe it was the same individual." Judge Alexander, director of the choir at Washington's church, viewed him as non-violent, dutiful and cooperative, stating "I still cannot believe that the David Washington I knew could do the things he was convicted of." The affidavit of Wilene Roberson, church secretary, reiterated the statements of other members of the church.

Cappie Martin, a neighbor who knew Washington for sixteen years and observed him almost every day, found his criminal activity "so out-of-character for the David Washington I knew," stating that he never seemed to have problems in the neighborhood and that he was respected.

Norman Cox, director of the high school band in which Washington played, recalled that he was an "outstanding leader" in the band, always cooperative; dependable and well liked. He never was "involved in any fights with the other kids." He found the murder "so totally out-of-character with what I knew about David Washington."

Finally, Leonard Brady, a police officer and ten-year neighbor of Washington, stated that "[i]n all of the years that I have observed deviant behavior as a police officer, I have never seen anyone do something like David has done, with the history and character that David has."

These statements were consistent with Tunkey's own statement that there were inexplicable differences between the Washington with whom he had talked extensively and the person who committed the murders. (See text, *supra* at p. 15022).

the time of the sentencing proceeding, but he stated that it was consistent with his opinion of Washington's mental state.[5]

Finally at the habeas hearing, Judge Richard Fuller, who presided at Wash-ington's guilty pleas and at his sentencing, was called on behalf of the state. Judge Fuller testified that his sentencing decision would not have been altered by the evidence contained in these affidavits.[6]

5. At the time of the introduction of the Jacobson Report, a question arose whether Judge Fuller, in sentencing Washington to death, had considered the report though it had not been available to Washington's counsel in his sentencing. This consideration of course, would have constituted a violation of the Supreme Court's holding in *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), that the sentencing judge may not consider a presentence report without advising the defendant or his counsel that he is doing so. Washington raised this potential *Gardner* violation in his appeal to this court. The district judge concluded that his review of the facts adduced at the habeas hearing bearing on the *Gardner* issue had led him to conclude that there was little factual merit to the issue. The district court's opinion reviews the testimony on that issue and concludes with the finding of fact that Judge Fuller was unaware of the Jacobson Report at the time of sentencing. We have reviewed the record carefully and conclude that, while Judge Fuller's testimony on the subject is conflicting, the record as a whole supports the district judge's conclusion. Certainly we cannot say that his finding is clearly erroneous.

6. Judge Fuller's testimony on this point at the habeas hearing was as follows:

Q. [By counsel for the State] Judge Fuller, I would ask you, in your experience today, if those matters had been presented to you and this case had been presented to you exactly as it is presented here, including these exhibits, assuming all of these exhibits are absolutely correct and not subject to any change from cross examination or anything else, would these exhibits have in any way affected your determination and your judgment as reflected in your order in this case?

MR. SHAPIRO [counsel for Washington]: I object to that question, your honor.

First of all, the question is so convoluted that I am not sure I quite understood it.

Secondly, it was compound and I object on that ground.

Also, I think that is a matter for this Court's ultimate determination as a matter of Federal Constitutional law.

I think the question of prejudice relates to the assessment of live witnesses and the credibility and demeanor of character witnesses and *it is one that the Judge is not capable or competent to answer.*

That is not the way a sentencing hearing is conducted, unless the Judge can make that opinion based on live testimony, demeanor of

all those witness and that is the appropriate way.

. . . . [The objection was overruled.]

BY MR. FOX [counsel for the State]:

Q. Do you understand the question?

A. Yes, sir, were I to have the folks that were good enough to give affidavits before me in court and heard their testimony and it was consistent with the contents of their affidavits and were these people to have been the best witnesses that I have ever seen and were they to be the most believable people that I have ever seen and I assessed them as the best from a demeanor point of view and everything else, *that information would not have changed my opinion then nor would it have changed my sentencing were I to give it today.*

Inasmuch as what David Washington told me himself at the time of his plea or at the time of the sentencing, the economic problems that he had, all about dollars and cents, problems with his family, perhaps problems with his step-father, most people who have found themselves in those circumstances, unfortunately have a rather depressing background.

I recognized that and I had a great deal of thought about David Washington, but the extensive amount of circumstances in this case, and six that are of an aggravating nature just outweighed everything else and I don't think any other judge that had the same facts in front of him today or at the time would have made a different decision.

Q. Do you have any doubts as to whether the death penalty was appropriate?

A. No, sir, no doubt at all.

Q. Do you have any doubts as to whether your judgment was correct in this case?

A. Thank you, I appreciate your saying "in this case."

I have labored over this and it is, in fact, correct if, in fact, there is a death penalty, then this is a death penalty case.

MR. FOX: No further questions.

(Emphasis added.) Later in the hearing, Judge Fuller elaborated upon this testimony in response to questioning from counsel for Washington:

Q. And you have had an opportunity to review the report of Dr. Lane and Dr. Barnard?

A. Yes, sir.

Q. And you testified that none of this information would have in any way changed your opinion as to the presentation [*sic*] or absence of statutory mitigating circumstances?

Following the two day hearing, the district court denied Washington's habeas petition in an unpublished memorandum opinion. The district court described Tunkey as "a competent, experienced criminal attorney, who in the Washington case, was faced with a unique and potentially overwhelming situation." The court concluded that Tunkey's professional judgment had been impaired by the evidence of Washington's guilt and his client's determination to confess his guilt. Turning to Washington's specific allegations as to the respects in which Tunkey's representation of him was constitutionally ineffective, the court noted that despite the fact that under Florida law Washington apparently was not entitled to a presentencing report as a matter of right and the fact that Tunkey was concerned that such a report, if requested and granted, might have proved detrimental, Tunkey's failure to request such a report was nonetheless significant: "it is evident [that] the report may have provided additional information in mitigation of the aggravating circumstances previously shown" by the State. The court concluded that the failure to obtain such a report must be evaluated in the context of counsel's overall performance. The court went on to find that Tunkey had erred in failing to conduct an independent investigation into Washington's character and background and the financial and personal circumstances in which Washington found himself at the time of the crimes and in failing to seek expert medical evidence which would have shed light on Washington's psychological reaction to his background and circumstances. Such an investigation, the district court found, would have been valuable because it would have revealed generally favorable evidence of Washington's character and background and provided corroboration for Washington's testimony concerning the pressures he was experiencing at the time of the crimes, factors which the district court found "may have had an impact on the sentence."

Despite this conclusion that Tunkey had erred by failing to conduct an adequate investigation in preparation for Washington's sentencing hearing, the district court denied Washington's habeas petition on the ground that Washington had made no showing of prejudice. The district court, considering Judge Fuller's testimony that the mitigating evidence contained in the affidavits would not have altered his sentencing decision and weighing the mitigating testimony contained in the affidavits against the aggravating circumstances revealed by Washington's testimony at the guilty pleas colloquy, concluded that "there does not appear to be a likelihood or even a significant possibility that the balancing of the aggravating against the mitigating circumstances ... would have been altered in petitioner's favor." The district court concluded that Washington had failed to meet his burden of showing that he had been prejudiced by Tunkey's inaction, and that Washington, therefore, had not been deprived of his constitutional right to effective assistance of counsel.

In a motion filed on April 27, Washington sought either a rehearing or a new trial on the basis of a new report that resulted from a psychiatric examination of Washington on April 16, 1981. In the words of the court below, this report "provide[d] the first indication that evidence may exist which shows that at the time of the offenses, [Washington] was under the influence of extreme mental or emotional disturbance or that he was unable to conform his conduct to the requirements of law"—factors that are statutory mitigating circumstances under Fla.Stat. § 921.141(6)(b), (f) (Supp.1981). After considering this report in conjunction with the evidence already in the record,

A. That wasn't what I testified to.

Q. Well, is it your testimony that none of this information would have in any way changed—

A. I said my testimony, sir, was had I had that information presented to me at the hearing, had it come from the most favorable witnesses from a demeanor's [sic] point of view or from physicians that I had appointed to make independent studies, that *that information would not have changed my opinion that this was a death penalty case.*

(Emphasis added.) See also note 29 *infra.*

however, the court adhered to its earlier conclusions and denied Washington's motion.[7] The court recognized that the newly-filed psychiatric report *was* relevant to two statutory mitigating factors. Nonetheless, the court concluded that because the psychiatrist's conclusions therein were based "on statements only recently made by Washington, including his admission as to a prior homosexual incident with ... the first murder victim," a similar evaluation conducted in 1976 would not have revealed this information. Further, the court noted that the conclusions contained in this report were directly contrary to the three previous psychological or psychiatric reports. Accordingly, the court found an "insufficient basis to conclude that findings consistent with [the latest report] would have been available to counsel if an independent psychiatric report had been obtained in 1976," and hence reaffirmed its earlier conclusion that Washington had not demonstrated adequate prejudice from Tunkey's inaction.

Finally, the district court had not allowed briefing or argument by the parties with respect to Washington's habeas attacks on his sentence that were predicated on grounds other than ineffective assistance of trial counsel;[8] nevertheless, the court stated that its "independent review of these issues reveals them to be meritless," and gave two examples of claims that were foreclosed by prior Supreme Court or Fifth Circuit precedent.

## II. THE EFFECTIVENESS OF WASHINGTON'S COUNSEL

On appeal, Washington does not dispute the district court's fact findings, and the State has not cross appealed those fact findings. Rather, Washington challenges the legal analysis employed by the district court in reaching its conclusion that Washington had not been so adversely affected by counsel's errors that habeas relief was appropriate. Before we examine this challenge in detail, we first review the standards which this circuit has developed to assess whether counsel in a criminal case has rendered constitutionally effective assistance. These standards have been developed in the context of cases examining counsel's performance in various phases of a criminal prosecution but not heretofore in the context of counsel's preparation for and performance during the sentencing phase of the bifurcated proceeding employed in capital cases. Therefore, in order to determine the manner in which these standards should be applied in the context of the sentencing phase of a capital case, we will then examine the purpose of the sentencing proceeding.

### A. Constitutional Standards for Effective Assistance of Counsel

█ We have recently had occasion to state the general standards by which this court reviews claims of ineffective assistance of counsel.

In this circuit, the standard for constitutionally effective assistance of counsel is "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance." *Herring v. Estelle*, 491 F.2d 125, 127 (5th Cir. 1974) (quoting *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960), *adhered to in pertinent part on rehearing en banc*, 289 F.2d 928 (5th Cir.), *cert. denied*, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961) (emphasis by *MacKenna* panel)). "[T]he methodology for applying this standard involves an inquiry into the actual performance of counsel conducting the defense and a determination of whether reasonably effective assistance was rendered based on the *totality* of circumstances in the entire record." *Washington v. Estelle*, 648 F.2d 276, 279 (5th Cir. 1981) (emphasis in original). The standard does not vary in accordance with whether counsel was retained or ap-

---

7. The court did grant a certificate of probable cause to appeal, and following Washington's timely notice of appeal, this court granted a stay of execution and ordered that the appeal be heard on an expedited basis.

8. See note 3 *supra* & accompanying text.

pointed. *Cuyler*, 446 U.S. [335] at 344–45 [100 S.Ct. 1708 at 1716, 64 L.Ed.2d 333]. *Washington v. Watkins*, 655 F.2d 1346, 1355 (5th Cir.), *rehearing denied*, 662 F.2d 1116 (1981). As the district court noted, our cases have recognized that counsel's preparation for trial, as well as his courtroom performance, must be considered in determining whether counsel has rendered reasonably effective assistance. Pre-trial " 'investigation and preparation are the keys to effective representation.' " *Rummel v. Estelle*, 590 F.2d 103 (5th Cir. 1979) (quoting ABA Projects on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function 224 (App. Draft 1971)). Thus, in order to provide reasonably effective assistance to their clients, criminal defense attorneys must interview potential witnesses and make an independent investigation of the facts and circumstances, as well as the law, involved in a particular case. *Id. Accord, Davis v. Alabama*, 596 F.2d 1214 (5th Cir. 1979), *vacated as moot*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980) ("[A]n attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense."). In the absence of such an independent investigation, counsel is unprepared to make an informed assessment of the defenses available to his client or to intelligently discuss the realities of the case with his client; such evaluations and frank discussions are, we have held, the " 'cornerstones of effective assistance of counsel.' " *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981) (quoting *Gaines v. Hopper*, 575 F.2d 1147, 1149–50 (5th Cir. 1978)).

■ This duty to investigate and prepare is, however, far from limitless, and not every breach thereof will mean that counsel has failed to render reasonably effective assistance. "[C]ounsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980). As we stated in *Washington v. Watkins*, 655 F.2d at 1356:

> Condemning the inevitable and understandable tendencies to the contrary, our cases uniformly command that counsel's effectiveness may not be assessed through the finely ground lenses of 20/20 hindsight—and this command is especially compelling in reviewing claims of ineffective assistance that are grounded in allegations of inadequate investigation and preparation. "Reasonably effective assistance" must be judged from the perspective of counsel, taking into account all of the circumstances of the case, but only as those circumstances were known to him at the time in question.

■ The district court, reasoning by analogy to the duty to investigate which we have recognized as an essential dimension of effective representation before and during the guilt phase of a criminal prosecution, held that counsel representing a convicted client at a sentencing proceeding has a similar duty "to make an independent search for witnesses with knowledge of the defendant's character, disposition to commit crimes [and] extenuating circumstances" in order to develop evidence which might mitigate punishment. We agree. "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and to a degree of guilt *or penalty.*" *Davis v. Alabama, supra* at 1217 (quoting from ABA Projects on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function § 4.1 (tent. draft 1970)) (emphasis added). Counsel's duty to conduct an independent investigation and develop information about his client's case extends "as fully to the dispositional phase of the proceedings as to pretrial preparation and courtroom advocacy." *United States v. Pinkney*, 551 F.2d 1241, 1246 (D.C.Cir.1976).

In capital cases, counsel's preparation for the sentencing as well as the guilt phase of the prosecution is especially important because of the nature and purpose of the distinctive sentencing procedure used in capital cases. The Supreme Court's evaluation of various death penalty statutes in the years following *Furman v. Georgia*, 408

U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), makes clear that the protection against arbitrary and capricious infliction of the death penalty which is afforded by the type of specialized sentencing procedure used in Florida is essential to the constitutional validity of capital punishment.

The Florida capital punishment statute, which the Supreme Court found free of constitutional infirmity in *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), provides for a separate sentencing hearing following conviction or adjudication of a capital offense. At the sentencing phase, "[e]vidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated [in the statute]." Fla.Stat. § 921.141(1) (Supp. 1981). In *Proffitt*, the Supreme Court concluded that this procedure provided sufficiently clear standards for the exercise of the sentencing discretion reserved to the trial judge to protect against the arbitrary and capricious infliction of the death penalty and to render the Florida statute free of the constitutional deficiencies identified in *Furman*. *Proffitt v. Florida, supra* at 251, 96 S.Ct. at 2966.

*Proffitt* and other Supreme Court cases following *Furman* have emphasized the essential importance of a procedure which allows the sentencing authority in a capital case to consider the character and personal history of the defendant in making the sentencing decision. The cases which have upheld the constitutionality of various death penalty statutes have rested the approval of these statutes, at least in part, on the opportunity afforded the defendant to introduce character evidence and other types of evidence of personal circumstances which might influence the sentencer to be merciful. *See Gregg v. Georgia*, 428 U.S. 153, 189–90, 206, 96 S.Ct. 2909, 2932–33, 2940, 49 L.Ed.2d 859 (1976) ("The new Georgia sentencing procedures ... focus the jury's attention on the particularized nature of the crime and the particularized circumstances of the individual defendant."). *Jurek v.*

*Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976) ("What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.... By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function."). By contrast, when the Court has found that a capital punishment statute has the effect of preventing the sentencer from considering all potentially mitigating factors reflected in a particular defendant's character and circumstances, the statute has been deemed constitutionally infirm. *See Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (Ohio statute which allowed consideration of only a limited range of specific mitigating circumstances held invalid because it prevented "the sentencer from considering any aspect of the defendant's character and record as an independently mitigating factor"); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (North Carolina statute mandating death penalty for certain categories of crimes found unconstitutional because of "its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition of death"). *Woodson* makes clear that it is only by use of a sentencing procedure which provides the sentencer with evidence concerning the personal background and situation of the defendant, that the death penalty may be inflicted in accordance with the Eighth Amendment.

While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, [citations omitted] requires consideration of the character and record of the individual

offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

428 U.S. at 304, 96 S.Ct. at 2991. *Accord, Eddings v. Oklahoma,* —— U.S. ——, ——, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982).

In the context of a capital sentencing proceeding, in which the integrity and validity of the decision making process are dependent on the decision maker's access to a wide variety of information concerning the defendant, we agree with the district court that "it is reasonable to require counsel to make independent investigation of the mitigating circumstances for sentencing and not to rely merely on the cross-examination of witnesses at a sentencing hearing and espousement of defendant's unsupported view of the events." *Lockett* indicates that this obligation extends not only to evidence tending to establish statutory mitigating circumstances but also to evidence of non-statutory mitigating circumstances.

At the risk of being repetitive, we emphasize that, in the context of a capital sentencing proceeding, counsel's duty to investigate is not limitless. To paraphrase the language of *Lovett v. Florida,* 627 F.2d at 708, counsel for a criminal defendant is not required to pursue every path until it bears fruit in the form of a morsel of evidence in mitigation or until all conceivable hope withers. Counsel's investigation need only be reasonable under the circumstances, and in evaluating the reasonableness of counsel's efforts, we look at the quality of his *overall* inquiry into the availability of evidence in mitigation. The purpose of the inquiry is to enable counsel to discover the kind of evidence in mitigation available and to make an informed and reasonable evaluation with his client of the advisability of using such evidence. If counsel's overall inquiry is sufficient for that purpose, then, insofar as the adequacy of his inquiry or investigation is concerned, he has been effective.

Nor, by emphasizing the importance of providing the sentencer in a capital case with the maximum amount of potentially mitigating information concerning the defendant, do we mean to suggest that the information developed by counsel's investigation must always be presented to the sentencer. There may be situations in which counsel, after having made an independent investigation into the defendant's character, background and circumstances at the time of the crimes, may make a considered and reasonable judgment that some or all of this evidence should not be introduced at the sentencing proceeding because it would not be, in his judgment, particularly persuasive or because it is likely to be more harmful to his client than helpful or because it might open the door for damaging cross-examination or rebuttal evidence. For example, if the only evidence in mitigation that counsel's investigation into the defendant's character, background and circumstances results in is evidence that the defendant was, at a point in time remote from the events in question, a good and responsible person or child, counsel might reasonably conclude that such evidence is not particularly persuasive on the issue of mitigation and decide not to use it. In reviewing ineffective assistance of counsel claims, we do not sit to second guess considered professional judgments with the benefit of 20/20 hindsight. *United States v. Johnson,* 615 F.2d 1125 (5th Cir. 1980); *Easter v. Estelle,* 609 F.2d 756 (5th Cir. 1980).

## B. The Proper Role of the Prejudice Requirement in the Effective Assistance of Counsel Analysis

In analyzing the assistance rendered by Tunkey in Washington's sentencing proceedings, the district court concluded that "Mr. Tunkey should have made an independent investigation of factors relevant to mitigation," and that "Mr. Tunkey made an error in judgment." But the court did not then decide whether these flaws, when considered in the context of Tunkey's overall representation in the sentencing proceedings, rose to the level of ineffective assistance. Rather, it was only after it had

decided that Washington had not been prejudiced by Tunkey's inaction that the court concluded that Washington "was not denied his Constitutional right to effective assistance of counsel." We must conclude that the court applied an erroneous method of analysis.

We recognized in *Washington v. Watkins* that "[s]ince we must not gauge the effectiveness of counsel by hindsight, ... *prejudice is a distinct inquiry from the initial question as to whether [counsel's inaction] made his representation of [the defendant] inadequate*, given the surrounding circumstances and the information available to [counsel] prior to trial." 655 F.2d at 1362 & n.23 (emphasis added). Considerations of whether the defendant was prejudiced by counsel's failings must play no part in the initial determination as to whether "counsel's representation satisfied the qualitative, normative standards dictated by the Sixth and Fourteenth Amendments to the Constitution," *id.* at 1354; otherwise, the constitutional guarantee of effective assistance would be transformed into an insurance policy that guarantees every defendant perfect and error-free representation, if not acquittal. "'Reasonably effective assistance' must be judged from the perspective of counsel, taking into account all of the circumstances of the case, but only as those circumstances were known to him at the time in question." *Id.* at 1356.

This is not to say that in assessing the sufficiency of counsel's representation, courts are forbidden to consider the *potential* for prejudice that should have been apparent to counsel at the time in question:

In determining whether reasonably competent counsel would have acted as defense counsel did, counsel's ability to foresee that prejudice might arise as a result of his actions plays an important role. Relief has [often] been denied where the prejudicial consequences of the challenged acts or omissions were not reasonably foreseeable at the time counsel acted or failed to act. Relief has [often] been granted where prejudice was foreseeable.

The courts have also considered whether counsel had reasonably available to him, at the time of the challenged act or omission, a course of action which was either (i) foreseeably less likely to result in prejudice to the defendant, or (ii) likely to result in prejudice which was foreseeably less severe than that resulting from the chosen course.

*Cooper v. Fitzharris*, 586 F.2d 1325, 1330 n.10 (9th Cir. 1978) (en banc) (citations omitted), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979).[9] But we cannot be true to our repeated assertions that counsel's effectiveness is not to be determined by hindsight if we inject considerations of prejudice—that is, the harm to the defendant's case, or lack thereof, that came about as a result of counsel's shortcomings—into the initial portion of the effective assistance analysis.

Except in those cases in which it is clear that there has been no prejudice whatsoever, however, it is preferable—though not essential—that the court considering the ineffective assistance claim first make a determination as to whether counsel's representation satisfied the dictates of the Sixth and Fourteenth Amendments, exclusive of any considerations of prejudice.[10] If the court concludes that counsel's representation *did* meet the constitutional norms, then whether prejudice accrued, and in what degree, are, strictly speaking, questions whose answers cannot affect the court's decision to grant or deny relief.

## C. The Operation of the Prejudice Requirement

*Washington v. Watkins* hinged in large measure upon our recognition that while

9. *See also* Note, *A Functional Analysis of the Effective Assistance of Counsel*, 80 Colum.L. Rev. 1053, 1076–79 (1980).

10. With regard to the standards by which we review district court findings of basic fact and conclusions as to the effectiveness of counsel in habeas cases, at least in those situations in which the district court has conducted an evidentiary hearing, see *Washington v. Watkins*, 655 F.2d at 1351–54.

"[t]he law of our circuit is as yet unclear as to the precise *degree* of prejudice that a defendant must demonstrate before he is entitled to habeas corpus relief on grounds that he received ineffective assistance of counsel, . . . it is clear that *some* degree of prejudice must be shown." 655 F.2d at 1362 (emphasis in original). In an accompanying footnote, we tracked the long line of Fifth Circuit cases indicating that some measure of prejudice must be shown; we noted, however, that "[h]ow much prejudice need be demonstrated appears to be as yet an open question" in the Fifth Circuit. *Id.* at 1362 n.32. It is still an open question, for in *Washington v. Watkins* we declined "to decide what degree of prejudice is necessary, . . . for [the petitioner] ha[d] failed to demonstrate that *any* prejudice whatsoever accrued from [his counsel's] failure to interview" certain key witnesses; on the record in that case, which did not include any showing as to what such interviews might have revealed, we "perceive[d] no way in which [the petitioner's] trial would have differed had [his counsel] conducted such interviews." *Id.* at 1363.

There is no substantial consensus among the circuits as to the kind or degree of prejudice that a petitioner must show before he may obtain federal habeas relief on ineffective assistance grounds; yet for at least some types of cases, a large majority of the twelve circuits appear to require a showing by the petitioner of *some* prejudice. The Third,[11] Eighth,[12] Ninth,[13] and

---

11. In *United States ex rel. Green v. Rundle*, 434 F.2d 1112 (3d Cir. 1970), the Third Circuit noted that the ineffective assistance inquiry cannot stop with a determination as to whether counsel departed from the standard of normal competence:

> In many instances ineffective assistance of counsel may have had so pervasive an effect on the process of guilt determination that it is impossible to determine accurately the presence or absence of prejudice. In other cases changes in circumstances since the original proceedings beyond petitioners' control, such as the death of a witness who was not called, may make it impossible at the time of the habeas corpus petition to determine prejudice. In such instances a finding of departure from the standard of normal competence requires without more, a new trial. In other cases the failure of counsel may be with respect to a narrow issue or area, and it may well be possible, in the habeas corpus proceeding, to determine whether or not the departure from normal competence was prejudicial. . . . When a habeas petitioner alleges as a ground for relief the failure of counsel to exercise normal competence in presenting specific trial evidence it is reasonable, we think, to put on petitioner the burden of showing that the missing evidence would have been helpful.

*Id.* at 1115..

In subsequent cases, the Third Circuit has denied habeas relief when it was clear that no prejudice had been shown. *E.g., United States v. Swinehart*, 617 F.2d 336, 341 (3d Cir. 1980) (no prejudice from failure to file suppression motion because motion would have properly been denied; no prejudice from failure to object to prosecutorial suggestion of defendant's guilt because defendant was not prejudiced by comments). The court has also applied the harmless error doctrine to certain ineffective assistance claims. *E.g., United States ex rel. Johnson v. Johnson*, 531 F.2d 169, 177 (3d Cir.), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976) (petitioner has the burden of proving that he was prejudiced by the variance between counsel's opening statement and his conduct at trial when counsel suggested in opening statement that he would present an alibi defense; however, "while the comment was unfortunate, it was harmless beyond a reasonable doubt" when viewed in the context of the entire trial); *United States v. Crowley*, 529 F.2d 1066, 1070–71 (3d Cir.), *cert. denied*, 425 U.S. 995, 96 S.Ct. 2209, 48 L.Ed.2d 820 (1976) (harmless error doctrine applies to denial of counsel at hearing on motion to withdraw guilty plea when the defendant alleges neither that he is innocent or that his original plea was involuntary and when it is clear that the defendant is not entitled to withdraw his guilty plea). *But see, Boyer v. Patton*, 579 F.2d 284, 288–89 (3d Cir. 1978) (involving prosecutorial comments on the defendant's silence at the time he was arrested—in which the court has held that the facts "demand the finding that [the defendant] was prejudiced as a matter of law").

12. The Eighth Circuit's position on this issue was clearly marked in *McQueen v. Swenson*, 498 F.2d 207 (8th Cir. 1974):

> Evaluation of a habeas corpus petition alleging ineffective assistance of counsel is a two-step process: first, determining, as we have already done, whether there has been a failure to perform some duty, as essential as the duty of investigation, owed by a defense attorney to his client; and second, determining, as will be done on remand, whether that failure prejudiced his defense. This second step is necessary, we believe, because the

District of Columbia [14] Circuits clearly require a showing of prejudice, and have well-

failure to investigate—though a constitutional error—might in certain circumstances be a "harmless" one and hence·would not justify habeas corpus relief. We are guided in this regard by *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), where the Court fashioned its harmless-constitutional-error rule.

*Id.* at 218. The court elaborated on this concept:

We ought not to intervene. in the criminal process unless and until it can be shown that the alleged error itself prejudiced the petitioner in obtaining a fair trial. But this is *not* to say that, on remand, petitioner must prove his innocence by even so much as a preponderance of the evidence; nor should we be understood to suggest that the Court may trespass upon what properly would have been the jury's province of weighing the truth or falsity of this evidence at the original trial. What we are saying is that, here, the petitioner must shoulder the burden of showing the existence of admissible evidence which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant either on cross-examination or in his case-in-chief at the original trial. Once this showing is made, a new trial is warranted unless the court is able to declare a belief that the omission of such evidence was harmless beyond a reasonable doubt. . . .

In lieu of such a showing, we hasten to add, the defendant must be allowed to demonstrate that changed circumstances beyond petitioner's control have made it impossible to produce any helpful evidence at this time. The latter circumstances, if proved, would serve to shift to the state the burden of showing the absence of any prejudice in the trial because of the inadequacy of the defendant's counsel.

*Id.* at 220 (emphasis in original).

The Eighth Circuit has consistently adhered to the *McQueen* standard. *See, e.g., Ford v. Parratt*, 638 F.2d 1115, 1118 (8th Cir. 1981) (when defendant enters a guilty plea, prejudice inquiry necessarily centers upon whether counsel's failure to investigate prejudiced defendant's ability to make an intelligent and voluntary guilty plea); *Morrow v. Parratt*, 574 F.2d 411, 413–14 (8th Cir. 1978) (petitioner prejudiced by counsel's failure to interview eyewitnesses because the evidence counsel would have discovered thereby "may have completely changed the defense strategy"); *Harshaw v. United States*, 542 F.2d 455, 456–57 (8th Cir. 1976) (petitioner failed to establish he was prejudiced by counsel's failure to conduct a pretrial investigation when record reflected "no allegation of anything such investigation might have been expected to produce and no indication of how its omission, if it occurred, was derelict

developed positions on the topic. The Second [15] and Fourth [16] Circuits also clearly and prejudicial"; neither was there prejudice from counsel's failure to make frivolous objections).

**13.** Sitting en banc, the Ninth Circuit in *Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979), explained its approach to the prejudice requirements as follows:

When the claim of ineffective assistance rests upon specific acts and omissions of counsel ·at *trial*, as it does in this case, relief will be granted only if it appears that the defendant was prejudiced by counsel's conduct.

*Id.* at 1331 (emphasis added). The court followed this holding with two cautionary comments:

If counsel is charged with multiple errors at trial, absence of prejudice is not established by demonstrating that no single error considered alone significantly impaired the defense—prejudice may result from the cumulative impact of multiple deficiencies.

Finally, the requirement that prejudice appear does not mean that relief is available only if the defendant would have been acquitted but for counsel's blunders.

*Id.* at 1333.

In *Ewing v. Williams*, 596 F.2d 391, 395–97 (9th Cir. 1979), the Ninth Circuit extended in full the holding of *Cooper v. Fitzharris* to ineffective assistance claims predicated on a lack of pretrial preparation, and in *United States v. Altamirano*, 633 F.2d 147, 152–53 (9th Cir. 1980), the court made clear that this standard applies both to direct appeals and collateral attacks. Apparently, however, the court has not clearly articulated the *degree* of prejudice that must be shown. *Compare Altamirano*, 633 F.2d at 153 (counsel's "many unprofessional acts when reviewed in the context of the entire trial did not deprive appellant of a fair trial," because the defendant's case "depended almost entirely upon his credibility," which was not impugned by counsel's failings), *with Cooper v. Fitzharris*, 586 F.2d at 1341 (Hufstedler, J., dissenting) ("While I do not agree that prejudice must be shown, if the majority·nonetheless adopts a harmless error approach, *Chapman v. California* . . . would govern the burden of proving prejudice"; burden would therefore be on prosecution to prove that the constitutional error was "harmless beyond a reasonable doubt.").

**14.** While the Court of Appeals for the District of Columbia has written extensively on the topic of prejudice, no clear rule emerges from *DeCoster v. United States*, 624 F.2d 196 (D.C.

Cir.) (en banc), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979), and its progeny. A plurality of the court held that "the accused must bear the initial burden of demonstrating a likelihood that counsel's inadequacy *affected the outcome of the trial*"; thereafter, "the conviction cannot survive unless the government demonstrates that it is not tainted by the deficiency, and that in fact no prejudice resulted"; if the showing by the accused causes the court serious misgivings notwithstanding the absence of a constitutional violation, government may prevail upon showing short of the *Chapman* standard. 624 F.2d at 208 & n.74 (opinion of Leventhal, J., joined by three judges) (emphasis added). A concurring opinion held that "a defendant must show *substantial unfair prejudice to his defense* resulting from a substantial violation of duty owed him by his counsel," at which point the burden shifts to the government to rebut this showing. *Id.* at 232 (MacKinnon, J., joined by two judges) (emphasis added). The dissent argued that once a petitioner has established his trial counsel's ineffectiveness, the burden is on the government to establish that any error was harmless beyond a reasonable doubt. *Id.* at 290–95 (Bazelon, J., dissenting, joined by one judge).

The en banc court's subsequent interpretation of *DeCoster* adds little:

[A] majority of the court is of the view that defendant does bear the burden of showing that counsel's substantial breach was likely to have resulted in prejudice to appellant's case. That is the formulation in Judge Leventhal's opinion. . . . It is necessarily included in the burden assigned to defendant in Judge MacKinnon's opinion: that defendant show that he actually suffered "unfair prejudice" as a result of counsel's breach.

*United States v. Wood*, 628 F.2d 554, 559 (D.C.Cir.1980) (en banc) (per curiam). *Wood* can be read to suggest that the petitioner need not show that he would have been acquitted, but for counsel's incompetence, in order to satisfy *DeCoster*'s requirement that he show an effect on "the outcome of the trial": "In order to secure a reversal, appellant must establish some basis for believing that a different kind of preparation would have resulted in the presentation of a contrary line of testimony for the jury's consideration." *Id.* at 559. Subsequent panel opinions are inconclusive on this point. *See, e.g., United States v. Hinton*, 631 F.2d 769, 782–83 (D.C.Cir.1980) (noting only that under *DeCoster* and *Wood* a defendant must establish that he has suffered "likely prejudice," at which point the government must prove beyond a reasonable doubt that the deficiencies were harmless). *But see United States v. Patterson*, 652 F.2d 1046, 1048 (D.C.Cir.1981) ("No counsel, however skillful, could have 'affected the outcome' of this case where appellant's identity was fixed by three eyewitnesses to the commission of the offense and no greater number of unidentified alibi witnesses, more than the three presented, would have prevented the inescapable jury finding of guilt.").

15. The Second Circuit requires that "claims of ineffective assistance must be premised on actual, not possible, prejudice to the client." *United States v. Aulet*, 618 F.2d 182, 188 (2d Cir. 1980) (following *LiPuma v. Commissioner, Department of Corrections*, 560 F.2d 84, 92 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977)). *Cf. United States v. Carrigan*, 543 F.2d 1053, 1055 (2d Cir. 1976) (when defendants claim that potential conflict of interest on the part of their joint attorney prejudiced their cause, some specific instance of prejudice must be shown before it can be said that they received ineffective assistance).

On some occasions, the Second Circuit has cited this rule in rejecting ineffective assistance claims because there has been *no* showing of prejudice. *E.g., Aulet*, 618 F.2d at 188 ("[H]ad a motion to suppress been made it would have been unsuccessful."); *LiPuma*, 560 F.2d at 92–93 (same). On other occasions, however, the Second Circuit's emphasis on the strength of the prosecution's case approaches an "outcome-determinative" analysis. *See, e.g., United States v. Williams*, 575 F.2d 388, 393 (2d Cir.), *cert. denied*, 439 U.S. 842, 99 S.Ct. 134, 58 L.Ed.2d 141 (1978) ("Other actions by [counsel], such as his tardy and unsuccessful application for production of a defense witness to discredit [the key prosecution witness], are not, to be sure, actions dictated by the demands of trial strategy. But given the strength of the government's case against [the defendant], it is extraordinarily unlikely that [the defendant] was at all prejudiced by his attorney's judgment."); *United States ex rel. Bradley v. McMann*, 423 F.2d 656, 657–58 (2d Cir. 1970), *cert. denied*, 400 U.S. 994, 91 S.Ct. 464, 27 L.Ed.2d 442 (1971) (rejecting ineffective assistance claim premised on counsel's failure to consult adequately with defendant, which resulted in counsel's failure to verify and bolster an alibi defense, because "[a]ppellant's alleged alibi was apparently not disclosed to counsel at a conference several hours before the trial began, but was mentioned for the first time when appellant testified"; moreover, the prosecution's rebuttal testimony "destroyed" the alibi, "thus bel[ying] the claim of prejudice resulting from the belated preparation of his trial counsel").

16. In *Coles v. Peyton*, 389 F.2d 224 (4th Cir. 1968), *cert. denied*, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968), the Fourth Circuit held that

[a]n omission or failure to abide by these requirements [of prompt appointment of counsel, adequate opportunity to prepare a defense, adequate consultation, and appropri-

require a showing of prejudice, although their positions on this issue are not as fully developed. There are some indications that the First [17] and Seventh [18] Circuits also re-

quire a showing of prejudice. The Tenth Circuit has addressed the issue, but appears to be undecided.[19] Only the Sixth Circuit appears to have rejected the prejudice re-

---

ate investigation] constitutes a denial of effective representation of counsel unless the state, on which is cast the burden of proof once a violation of these precepts is shown, can establish a lack of prejudice thereby. *Id.* at 226. In subsequent cases, the Fourth Circuit appears to have alluded to the prejudice requirement only briefly and obliquely. *See, e.g., Via v. Superintendent, Powhatan Correctional Center,* 643 F.2d 167, 175 (4th Cir. 1981) (finding "obvious" the prejudice the petitioner suffered when counsel pressured him into pleading guilty in part because counsel was unprepared to try the case: "Via had a right to plead not guilty and go to trial.... He was prejudiced when this right was frustrated because his counsel was unprepared to represent him effectively."); *Marzullo v. Maryland,* 561 F.2d 540, 546 (4th Cir. 1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978) (noting simply that attorney's failure to exclude jury during interrogation of the prosecuting witness about the crime charged in another rape indictment "failed to protect [the defendant] from the prejudicial effects of the jury's exposure to the first rape charge").

17. On at least one occasion, the First Circuit has declined to grant habeas relief at least in part on grounds that there had been no showing of prejudice. *United States v. Ritch,* 583 F.2d 1179, 1183 (1st Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978) (petitioner had demonstrated no prejudice from counsel's failure to file suppression motion because motion would have been denied; neither was he prejudiced by counsel's failure to interview potential defense witnesses because the substance of their testimony was in fact presented to the jury). One week later, the First Circuit noted that "[t]he circuits are split on the question of whether an infraction of the sixth amendment right to effective assistance can ever be treated as harmless error, and if so, which party has the burden of proof." *United States v. Bosch,* 584 F.2d 1113, 1122 (1st Cir. 1978). But the court concluded that because "the error was clearly not harmless in the present case, we leave for another day the issue of whether deprivation of effective assistance can ever constitute harmless error." *Id.* at 1123.

18. In *United States ex rel. Healey v. Cannon,* 553 F.2d 1052, 1057 n.7 (7th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 221, 54 L.Ed.2d 153 (1977), the court rejected the conclusion of an Illinois appellate court that any mistaken advice afforded the petitioner constituted harmless error due to the overwhelming evidence of guilt; the court noted that "the harmless error

doctrine is patently inapplicable to the claimed deprivation of a due process right so fundamental as the effective assistance of counsel." Yet in denying habeas relief in *United States v. Berkwitt,* 619 F.2d 649, 659 (7th Cir. 1980), the court relied in part on the petitioner's failure "to support his contention [of ineffective assistance] with any specific instance of prejudice." And in *United States v. Cooper,* 580 F.2d 259, 263 n.8 (7th Cir. 1978), the court noted that "[t]here has been no showing by appellant whatsoever that a defense of insanity would have been meritorious and that waiver of such a defense [by counsel] was prejudicial." Finally, in *United States v. Ingram,* 477 F.2d 236, 240 (7th Cir.), *cert. denied,* 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973), the court explicitly rejected an ineffective assistance claim on grounds that none of counsel's five purported failings had been prejudicial.

19. In *United States v. Porterfield,* 624 F.2d 122 (10th Cir. 1980), the Tenth Circuit rejected the suggestion that

"prejudice" is a second tier in the test of incompetency. Reasonable diligence and skill is the test! It would be a mockery in this case to say that the defendant was clearly guilty and that the incompetence of counsel made no difference. Where, as here, the incompetence of counsel is persuasive, the defendant ought not to be required to prove prejudice on top of the inadequacy. The burden should be on the government to establish the lack of prejudice.... Nor is this a case in which discrete trial errors had been committed. *Cf. Cooper v. Fitzharris ....*

*Id.* at 125. In *United States v. Golub,* 638 F.2d 185 (10th Cir. 1980), the court stopped short of holding that prejudice is never relevant, but declined to require such a showing in the case before it: "[P]roof of specific prejudice is not always required in order to render assistance of counsel ineffective, particularly when, as here, the record establishes that trial counsel simply did not have adequate time to prepare for trial." *Id.* at 190. In that case, "[t]he surrounding circumstances, in and of themselves, evidence[d] the prejudice without further proof." *Id.* Most recently, however, the Tenth Circuit has indicated that both of these holdings may be "questionable" in the light of *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981), and decisions from other circuits. *See United States v. King,* 664 F.2d 1171, 1173 (10th Cir. 1981); and *United States v. Payne,* 641 F.2d 866, 867–68 (10th Cir. 1981).

quirement altogether, although there are reasons to believe that it is reconsidering its position.[20]

The various commentators that have addressed the topic are generally hostile to the prejudice requirement.[21] Indeed, for some time there was reason to believe that Supreme Court precedent was absolutely inconsistent with the prejudice requirement.[22] Most recently, however, a unanimous Supreme Court has explicitly confirmed that "certain violations of the right to counsel may be disregarded as harmless error." *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). After reviewing its prior precedent on effective assistance, the Court found this common thread:

> Our approach has thus been to identify and then neutralize the taint by tailoring suitable relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that *the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.*

*Id.* (Emphasis added).

Both the Supreme Court and the courts of appeals have recognized that some species of ineffective assistance claims by their nature either require no demonstration of potential or actual prejudice or are presumptively harmful. These include claims that no counsel was appointed;[23] that counsel was appointed but was prevented by a systemic defect from discharging functions vital to effective representation;[24] that counsel was subjected to a conflict of interest through his representation of mul-

---

**20.** The Sixth Circuit appears to be alone in failing to require any showing of prejudice from counsel's ineffective representation. In *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974), the Sixth Circuit held that "[h]armless error tests do not apply in regard to the deprivation of a procedural right so fundamental as the effective assistance of counsel." *Accord, United States v. Yelardy*, 567 F.2d 863, 865 n.1 (6th Cir.), *cert. denied*, 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140 (1978). *Cf. United States v. Sumlin*, 567 F.2d 684, 688–89 (6th Cir. 1977), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978) (finding harmless beyond a reasonable doubt the admission of evidence that petitioner claimed should have been suppressed because it was obtained from defendant by FBI agents while defendant was represented by allegedly ineffective counsel). Although the court reaffirmed *Beasley*'s holding in *McKeldin v. Rose*, 631 F.2d 458, 460–61 (6th Cir. 1980), *cert. denied*, 450 U.S. 969, 101 S.Ct. 1488, 67 L.Ed.2d 619 (1981), the court qualified it by holding that "[w]here the error occurs at a preliminary hearing in state proceedings and the state invokes harmless error as a reason for denying relief, a harmless error analysis is required." Of course, the general rule recognized in the Sixth Circuit may be subject to modification after *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981), discussed *infra* in text. *Cf. Turner v. Engel*, 673 F.2d 1331 (6th Cir. 1981) (citing in dicta *Walker v. Solem*, 648 F.2d 1188, 1189 (8th Cir. 1981), for the proposition that the petitioner "must show both incompetence and material prejudice resulting from the incompetence in order to prevail on his claim.")

**21.** *See, e.g.*, Note, *supra* note 9, at 1062–65; Erickson, *Standards of Competency for Defense Counsel in a Criminal Case*, 17 Am.Crim. L.Rev. 233, 249 & n.137 (1979); Note, *Ineffective Assistance of Counsel and the Harmless Error Rule: The Eighth Circuit Abandons Chapman*, 43 Geo.Wash.L.Rev. 1384 (1975).

**22.** *See Davis v. Alabama*, 596 F.2d 1214, 1221–22 (5th Cir. 1979), *vacated as moot*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980); *Cooper v. Fitzharris*, 586 F.2d 1325, 1332 (9th Cir.) (en banc), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979); and the cases cited and distinguished in each.

**23.** *E.g., Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

**24.** *E.g., Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (defense counsel not permitted to confer with his client during overnight mid-trial recess); *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (state statute barred final summation by defense counsel).

tiple defendants;[25] and that counsel's representation was not merely deficient or inadequate in many or most respects, but was functionally equivalent in every respect to having no representation at all.[26] Washington suggests that because Tunkey "candidly admitted that once the multiple confessions were given, he had a feeling that nothing could be done to save Washington," his claim falls within the last category enumerated above.

We cannot agree. Despite his shortcomings, Tunkey was more than a warm body occupying a chair at the counsel table in the sentencing proceedings. He consulted with and advised his client, even though his client chose not to follow that advice. He made some strategic decisions. He presented evidence favorable to his client, and succeeded in excluding some unfavorable evidence. He argued persuasively, if unsuccessfully, that his client should not be sentenced to death.

■■■ Thus, given the nature of Washington's claim, it is clear that he must show that his case was prejudiced by Tunkey's alleged failings. *See Washington v. Watkins*, 655 F.2d at 1362 & n.32, and cases cited therein.

The district court found that Washington adequately demonstrated that had Tunkey "made an independent investigation of factors relevant to mitigation, . . . such investigation would have produced generally favorable information from family, friends, former employers, and medical experts." Yet the court nonetheless held that there had been "no showing of prejudice."

■■■ In so concluding, the district court was, apparently, borrowing from the analysis employed in *Knight* and *DeCoster* which require that a petitioner carry the burden of demonstrating "a likelihood that the deficient conduct affected the outcome of the court proceedings." *Knight, supra*, 394 So.2d at 1001. We decline to adopt a prejudice requirement which places such a heavy additional burden on a petitioner who has already demonstrated that his proceedings were tainted by error of constitutional magnitude. To require a petitioner to establish a likelihood that the outcome of criminal proceedings would have been altered in his favor had the error not occurred would require that the court hearing the ineffective assistance claim put itself in the place of the trial-court factfinder in an attempt to predict with some considerable degree of accuracy what that factfinder would have done had it been presented with different evidence. We think that a framework for analysis which would inevitably require us, in determining whether the petitioner has made out a prima facie case for habeas relief, to engage in such highly speculative re-creations and revisions of trial court proceedings is to be avoided rather than embraced. Therefore, we conclude that although a habeas petitioner seeking

**25.** *E.g., Cuyler v. Sullivan*, 446 U.S. 335, 348–50, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Glasser v. United States*, 315 U.S. 60, 75–76, 62 S.Ct. 457, 467, 86 L.Ed.2d 680 (1942) ("The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."); *Johnson v. Hopper*, 639 F.2d 236, 238–39 (5th Cir. 1981). *See also Slappy v. Morris*, 649 F.2d 718, 722–23 (9th Cir. 1981) (when trial judge denied indigent defendant's Sixth Amendment right to counsel by refusing to grant continuance without inquiring as to probable length of unavailability of defendant's first appointed counsel, defendant was not required to show prejudice; second appointed attorney's effectiveness at trial "irrelevant").

**26.** *E.g., Davis v. Alabama*, 596 F.2d 1214, 1221–22 (5th Cir. 1979), *vacated as moot*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980) ("[I]f a defense attorney were to put on what amounted to no defense at all, we would 'not stop to determine whether prejudice resulted,' *Hamilton v. Alabama*, 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961)."). *See also Torna v. Wainwright*, 649 F.2d 290, 292 (5th Cir. 1981); *Perez v. Wainwright*, 640 F.2d 596, 598–99 (5th Cir. 1981) (both holding that when a defendant is denied an opportunity timely to appeal because of his counsel's failure to "perform his promise that an appeal would be taken," fairness requires that the deceived defendant be granted an out-of-time appeal"; since counsel's ineffectiveness wholly deprived the defendant of an appeal, the defendant need make no showing that an issue of arguable merit will be raised in the out-of-time appeal).

relief on the basis of a claim of ineffective assistance of counsel must generally make a showing of prejudice, this prejudice requirement is satisfied by demonstrating that but for his counsel's ineffectiveness his trial, but not necessarily its outcome, would have been altered in a way helpful to him. While our cases have not articulated a standard for how material the change in the trial would have to be in order for a petitioner to meet his burden of showing prejudice, it is clear from reviewing those cases that the change must be something more than insubstantial or de minimus. *See Washington v. Watkins*, 655 F.2d at 1362 n.32 and cases cited therein. If the petitioner meets this burden, the court should then examine the impact of counsel's ineffectiveness within the framework of the harmless error rule of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). If the petitioner carries the burden of showing ineffectiveness and prejudice, the State may then attempt to show beyond a reasonable doubt that although counsel's ineffectiveness was prejudicial to the petitioner, in the sense that the trial would have proceeded in a different and more helpful way in the absence of these errors by counsel, counsel's ineffectiveness was harmless in that it did not contribute to the petitioner's sentence within the meaning of *Chapman* and its progeny.[27] In contrast to *Knight* and *DeCoster*, under this framework of analysis, if determining the effect of counsel's ineffectiveness involves an unacceptable degree of speculation concerning what would have happened in the trial court had counsel been effective, the impossibility of determining whether and how counsel's ineffectiveness contributed to petitioner's conviction or sentence will not preclude relief for an individual who has already established the existence of a constitutional violation and some prejudice as a result. We believe that this allocation of the burden of proof in a habeas proceeding involving a claim of ineffective assistance more fairly allocates the not insubstantial risks of error inherent in any ineffectiveness analysis than does an analysis which effectively requires the petitioner to carry not only the weighty burden of establishing his counsel's ineffectiveness but also the burden of proving, in effect, that counsel's ineffectiveness determined the outcome of his trial.

### D. The Admissibility of the Sentencing Judge's Testimony on the Question of Prejudice

One other aspect of the sentencing phase merits careful consideration. At the evidentiary hearing conducted in the court below, Judge Richard Fuller—the state trial judge who sentenced Washington to death—testified as to a number of matters of basic, historical fact that were relevant, and indeed crucial, to Washington's habeas claims. For example, Judge Fuller testified as to whether he had had access to the Jacobson psychiatric report prior to sentencing, and as to Tunkey's general reputation as a criminal lawyer and his representation of Washington. That testimony was entirely appropriate. *See* 10 *Moore's Federal Practice* § 605.02. Over timely and

---

**27.** In holding that when a defendant has established that his counsel's inadequacies rose to the level of constitutionally ineffective assistance of counsel and that he was prejudiced thereby, a grant of habeas corpus or other appropriate relief is warranted unless the State can demonstrate that counsel's ineffectiveness was harmless beyond a reasonable doubt, we join the Third and Eighth Circuits. See notes 11 & 12, *supra*.

Few cases in which a determination of whether error is harmless beyond a reasonable doubt set forth any standard to be used to determine whether the evidence is, in fact, harmless. This paucity can be traced to the difficulty in developing a consistent approach when myriad types of error may occur and must be analyzed. It is thus important to recognize that different types of error require different analyses in the determination of harmlessness. *See* Field, *Assessing the Harmlessness of Federal Constitutional Error a Process in Need of a Rationale*, 125 Pa.L.Rev. 15 (1976).

For examples of cases in this circuit applying the harmless beyond a reasonable doubt standard, see *United States v. Lay*, 644 F.2d 1087 (5th Cir. 1981); *Germany v. Estelle*, 639 F.2d 1301 (5th Cir. 1981); *Wilson v. Estelle*, 625 F.2d 1158 (5th Cir. 1980); *United States v. Hernandez*, 574 F.2d 1362 (5th Cir. 1978); *Jackson v. Wainwright*, 390 F.2d 288 (5th Cir. 1968).

adequately specific objections from Washington,[28] however, the court below also permitted Judge Fuller to testify at length as to the weight he had accorded the aggravating and mitigating circumstances that he found were present in the case,[29] and as to whether the evidence that Washington suggests would have been presented by constitutionally effective counsel would have made a difference in his sentencing determination.[30]

In its memorandum opinion, the district court recognized "the potential weakness of hindsight analysis," and accordingly did not treat "Judge Fuller's testimony as determinative on the issue of prejudice." However, the court squarely and unambiguously stated that "[i]n reaching this determination [*i.e.*, that Washington was not prejudiced by his counsel's inactions], I have considered Judge Fuller's testimony that even if he had considered the live testimony of character and psychiatric witnesses, as proposed in the affidavits, he believes he would have imposed the death sentence." We must conclude that the court erred in attaching any probative value whatsoever to Judge Fuller's testimony on this subject, for that testimony should have been excluded.

Well over 100 years ago, the Supreme Court observed that

the secret deliberations of the jury, or grounds of their proceedings while engaged in making up their verdict, are not competent or admissible evidence of the issues or findings. The jurors oftentimes, though they may concur in the result, differ as to the grounds or reasons upon which they arrive at it.

BY MR. FOX:

Q. How would you characterize the array of the aggravating circumstances in this case, in your experience?

A. They were vast. It has been my experience in handling the Opa Locka murders and others in this community and I would say these murders were as bad as any I have had, no lack [*sic*] of concern for people and their dignity. The manner in which these people were shot, stabbed or treated, it was overwhelmingly tragic.

Q. In your sentencing order, Judge, you find no statutory mitigation, but it states that there was insufficient mitigation.

Can you explain that?

A. As I remember the facts, Mr. Fox, of the enumerated group of mitigating circumstances, there were none and maybe my English wasn't appropriate because I wrote my own orders and I didn't ask the State Attorney to prepare these, I had considered his age, his family, the things he told me, his candor with the Court and I considered the authority, that his admission had been given and to me anybody that would get up in public and say they have done something wrong, gets a lot of stripes on his side. I think that is the first step and I was particularly pleased that he took this position, although not enumerated by the Court, *but it didn't add enough weight from the position where I thought I should be*, to impose the death penalty which, of course, I did not get any pleasure from. (Emphasis added.)

**28.** See the italicized language in note 6 *supra* and note 29 *infra*. Contrary to the State's suggestion, these contemporaneous objections were entirely adequate under Fed.R.Evid. 103(a)(1). Further, the motion to strike this testimony presented by counsel for Washington on the second morning of the evidentiary hearing was even more detailed and specific.

**29.** In response to questioning by counsel for the State, Judge Fuller gave the following testimony at the federal evidentiary hearing:

Q. In your sentencing order, Judge, you found a vast array of aggravating circumstances in this case.

Do you recall those aggravating circumstances?

A. I recall that there were a lot of them. I recall that they were well planned, well thought out violent homicides and even with Bill Tunkey's pleasant smile and graciousness to the Court and all other things, it wasn't enough to take away from the seriousness of the crime.

So, I could tell you yes, the number of robberies involved, a question of burglarizing the house, breaking and entering and a various number of aggravating circumstances.

Q. Would you characterize the circumstances as moderate, light, overwhelming?

MR. SHAPIRO: Your Honor—

MR. FOX: In your experience.

MR. SHAPIRO: Your Honor, I object. *The findings have already been recorded and were contemporaneous with his time of sentencing and they speak for themselves.* There is no reason for him to testify at this point.

. . . . [The objection was overruled.]

**30.** See note 6 *supra*.

The evidence should be confined to the points in controversy on the former trial, to the testimony given by the parties, and to the questions submitted to the jury for their consideration, and then the record furnishes the only proper proof of the verdict.

*Packet Co. v. Sickles*, 72 U.S. (5 Wall.) 580, 593, 18 L.Ed. 550 (1866). *See also McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915).

Early in this century, the Court extended the rule of *Packet Co. v. Sickles* to bar testimony from a judge on the question whether, in fashioning his decree, he had considered the validity of releases given by certain parties to a probate proceeding:

Tested by the rule [of *Packet Co. v. Sickles,*] the testimony of the trial judge, given six years after the case had been disposed of, in respect to matters he considered and passed upon, was obviously incompetent. True, the reasoning of the court for the rule is not wholly applicable, for as the case was tried before a single judge there were not two or more minds coming by different processes to the same result. Nevertheless no testimony should be received except of open and tangible facts—matters which are susceptible of evidence on both sides. A judgment is a solemn record. Parties have a right to rely upon it. It should not be lightly disturbed, and ought never to be overthrown or limited by the oral testimony of a judge or juror of what he had in mind at the time of the decision.

*Fayerweather v. Ritch*, 195 U.S. 276, 306–07, 25 S.Ct. 58, 67, 49 L.Ed. 193 (1904). And in *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), the Court held that it was improper to allow certain marketing agencies who were attacking rates fixed by the Secretary of Agriculture to examine the Secretary as to the mental processes by which he reached his conclusions:

The proceeding before the Secretary "has a quality resembling that of a judicial proceeding." ... Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that "it was not the function of the court to probe the mental processes of the Secretary." ... Just as a judge cannot be subjected to such scrutiny, compare *Fayerweather v. Ritch*, 195 U.S. 276, 306–07, 25 S.Ct. 58, 67, 49 L.Ed. 193, so the integrity of the administrative process must be equally respected.

*Id.* at 422, 61 S.Ct. at 1004.

Although the issue arises only infrequently, this court has as recently as 1978 confirmed the continued validity of the *Fayerweather* doctrine. In a double jeopardy case that involved a trial judge's conflicting statements as to his motivation in granting a mistrial, we explained:

Just as courts will not review the motives of a legislature in enacting a law, ... this court will not review the mental processes of a trial judge. A judge's statement of his mental processes is absolutely unreviewable. This court has no means of observing mental process.... *The trial judge's statement of his mental process [in his written order] is so impervious to attack that even if he were to come forward today and declare that his memorandum misstated his reasons for the mistrial, we could not consider his explanation.*

*United States v. Crouch*, 566 F.2d 1311, 1316 (5th Cir. 1978) (citing *Fayerweather*; emphasis added).[31]

We note too that the case from which the *Fayerweather* doctrine was derived—*Packett Co. v. Sickles*—was thought sufficiently important that it was effectively codified

---

**31.** *Cf. Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1037–38 n.5 (5th Cir. 1981) (noting that court of appeals is not bound by procedural label that district court puts on its action when underlying facts or opinion as a whole demonstrate that a different action was in fact intended; the district court's later characteriza-tion of its decision has even less persuasive import than the label placed on the initial decision, for the parties had to act on the basis of the decision itself and cannot fairly be expected to have foreseen the court's later characterization of its action).

by Congress and the Supreme Court in Fed. R.Evid. 606(b), which provides in pertinent part as follows:

Upon inquiry into the validity of a verdict or indictment, *a juror may not testify as to* any matter or statement occurring during the course of the jury's deliberations or to *the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith*, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

(Emphasis added.) *See generally* 3 J. Weinstein & M. Berger, Weinstein's Evidence § 606[04] (1978 & 1981 Supp.).

We have accordingly held, in keeping with both Rule 606(b) and the long-established common-law principles that underlie it, that post-verdict inquiries which seek to probe the mental processes of jurors are impermissible. *E.g., United States v. Duzac*, 622 F.2d 911, 913 (5th Cir. 1980); *Llewellyn v. Stynchcombe*, 609 F.2d 194, 196 (5th Cir. 1980). An attempt to use information extrinsic from the jury's verdict "to probe its process of deliberation and find out how and why the jury reached its verdict . . . is the one form of attack on a verdict that has always been forbidden in Anglo-American criminal law." *United States v. D'Angelo*, 598 F.2d 1002, 1004 (5th Cir. 1979). As we observed in that case,

[w]ere the courts permitted to retry [verdicts that are so attacked], the result would be that every jury verdict would either become the court's verdict or would be permitted to stand only by the

court's leave. This would destroy the effectiveness of the jury process which substantial justice demands and the [C]onstitution guarantees.

*Id.* at 1005. We believe that the rationale of these cases applies equally here, for Washington, by waiving his right under Florida law to an advisory jury determination as to his sentence, essentially substituted Judge Fuller for his jury.

Further, we agree with Washington that there are strong policy reasons for prohibiting the use of this sort of testimony. No doubt most judges will remember the capital cases over which they have presided more clearly than cases charging lesser offenses. Yet it is unrealistic to expect that a trial judge can, using nothing more than a cold record and his own recollections, completely and accurately reconstruct his thought processes in one particular case that he decided over four years earlier. In addition to these mental gymnastics, a judge would have to push aside his natural human tendencies to justify his past actions with post hoc rationalizations. And it blinks reality to assume that a trial judge can also describe with any degree of certainty the process by which any additional information would have factored into his mental calculus had it been presented at the time of sentencing. Our society demands much of trial judges in this day and time; it cannot, however, fairly demand that they be omniscient.

■ The State suggests here, as it did in the court below, that Judge Fuller's testimony was competent as an opinion by an expert witness on an ultimate issue in the proceedings. *See* Fed.R.Evid. 702, 704.[32] This argument is patently absurd, and is supported by no precedent whatsoever.[33]

---

**32.** Fed.R.Evid. 702 provides as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, training, or education, may testify thereto in the form of an opinion or otherwise."

Fed.R.Evid. 704 provides as follows: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable be-

cause it embraces an ultimate issue to be decided by the trier of fact."

**33.** At oral argument in this appeal, counsel for the State conceded that no case directly supports the use of such testimony:

Q. What case do you have from any civilized jurisdiction in the entire world that says

Judge Fuller might possibly have been competent to testify as an expert on some issues—*e.g.*, matters relating to Florida court operations and procedural law. We might accept arguendo the extremely dubious proposition that one testifies as an "expert," rather than as a lay witness, when one attempts to recreate the mental processes in which he engaged on a past occasion. But when a judge's mental processes in sentencing a defendant constitute the "fact in issue" as to which the judge arguably is qualified to testify "as an expert by knowledge, skill, experience, training, or education," whether he was so qualified is irrelevant: courts are absolutely forbidden to inquire into that "fact" under *Fayerweather*, its progeny, and its kin.

In summary, it was error for the district court to have considered Judge Fuller's testimony as to his mental processes in sentencing Washington and his speculation as to how those processes might have differed had additional evidence been presented to him when he made the sentencing decision.

## III. CONCLUSION

We have concluded that the district court employed an incorrect method of analysis of Washington's claim that he was deprived of the effective assistance of counsel at the sentencing phase of his prosecution for murder. On remand, the district court should first make a determination as to whether Tunkey's overall representation of Washington at the sentencing phase rose to the level of ineffective assistance of counsel. If the district court concludes that,

under the standards developed in this circuit and summarized in part IIA of this opinion, Tunkey's representation satisfied the requirements of the Sixth and Fourteenth Amendments, then his effective assistance of counsel inquiry is at an end. If he concludes that Tunkey's representation at the sentencing phase was constitutionally ineffective, he should then consider whether the petitioner has met his burden of showing prejudice, *i.e.*, that but for his counsel's ineffectiveness the sentencing phase, but not necessarily its outcome, would have been altered in a way helpful to him. If the court concludes that the petitioner has made a showing of prejudice, then the petitioner has made out a prima facie case for habeas relief, and the court should then address whether the State has succeeded in showing beyond a reasonable doubt that Tunkey's ineffectiveness was harmless, *i.e.*, that it did not contribute to Washington's sentence within the meaning of *Chapman* and its progeny. In making these determinations, the court should not take into consideration Judge Fuller's testimony as to his mental processes in sentencing Washington or his speculation on how those processes might have differed had additional evidence been presented to him.

■ One final matter merits special treatment in this opinion. The district court summarily rejected over a dozen of Washington's grounds for habeas relief without allowing briefing or argument thereon by the parties.[34] The district court

---

a sentencing judge could testify as to whether something made any difference or didn't make any difference?
 A. Your Honor, I think any, any witness' testimony—
 Q. Can you give me an answer to that question first, and then argue with me? Do you have any case, anywhere?
 A. I would submit to you any case relating to the testimony of a witness recalling his subjective and objective observations.
 Q. That's no answer. Do you have one about a judge?
 A. I don't have one about a judge, Your Honor.
Neither has the State referred us to such any such precedent subsequent to the time this case was argued.

34. The State has cross-appealed the district court's refusal to dismiss Washington's petition for abuse of the writ. The district court specifically declined the State's invitation to find that Washington had deliberately delayed the filing of his state-court post-conviction challenges to his death sentences. (The Florida courts also rejected this argument.) Additionally, the district court noted that the State's "arguments about undue delay are uniquely unpersuasive in a death penalty case."
 The shortest of many answers to the State's cross-appeal is that it has not demonstrated that it "has been prejudiced in its ability to respond to the petition by delay in its filing." Rule 9(a), Rules Governing § 2254 Cases in the United States District Courts. *Compare Baxter v. Estelle*, 614 F.2d 1030, 1032–35 (5th Cir.

stated that its "independent review of these issues reveals them to be meritless," but other than giving two examples, the court did not explain *why* those issues were without merit. This makes the process of appellate review extremely difficult.

As then-Circuit Judge Warren Burger remarked over twenty years ago,

> [i]t is ... imperative that denial either of leave to file the petition, *or denial of the writ itself,* be accompanied by an expression of the reasons for the denial either by informal memorandum, by recitals in an order, or by findings.

*Tatem v. United States,* 275 F.2d 894, 896 (D.C.Cir.1960) (emphasis added). *Accord, Shinall v. Breazeale,* 404 F.2d 785 (5th Cir. 1968).

 We agree with the petitioner that the district court should have addressed separately each ground for relief raised by the petitioner, and on remand the district court should do so. *Shinall,* 404 F.2d at 787. We emphasize that this does not require that the court write the definitive legal treatise on each point so raised; to the contrary, in many if not most instances, no more than a sentence or two and a citation to a case or a record reference will enable this court to give meaningful review to the district court's factual and legal conclusions. Further, we note that in many instances—and especially in a rapidly evolving area of the law, as has been the case with capital punishment doctrine in the past decade—the same arguments are repeated verbatim by one after another petitioner. What may be obviously frivolous to one court may not immediately seem to be so to another; an articulation of the court's reasons for rejecting a habeas claim is obviously important for *stare decisis* purposes,

as well as for considerations of judicial economy on appeal.

We affirm the portion of the district court's judgment to the effect that the sentencing judge was unaware of the Jacobson Report at the time Washington was sentenced. See note 5, *supra.*

Each party shall bear its own costs.

AFFIRMED IN PART, VACATED IN PART and REMANDED with instructions.

RONEY, Circuit Judge, dissenting:

I would affirm. The question before the district court was whether this state prisoner, sentenced to death for three murders, was deprived of his Sixth Amendment right "to have the Assistance of Counsel for his defence". This constitutional mandate, visited upon the states through the Fourteenth Amendment,[1] has been interpreted to require "effective" assistance of counsel[2] at sentencing, as well as at trial.[3]

Attorney William Tunkey was appointed to represent Washington. He was a well established criminal lawyer, thoroughly experienced in criminal and capital cases. After Tunkey had prepared for trial on one murder, petitioner pled guilty to all three, contrary to his attorney's advice. The acts committed by Washington, which made him a prime candidate for capital punishment if there is to be capital punishment at all, are fully recited in the Florida Supreme Court's opinion affirming the death sentence. *Washington v. State,* 362 So.2d 658 (Fla. 1978), *cert. denied,* 441 U.S. 937, 99 S.Ct. 2063, 60 L.Ed.2d 666 (1979).

On September 20, following carefully arranged plans, Washington stabbed to death Daniel Pridgen, a minister, while an accomplice restrained the victim and covered his

1980) (finding prejudice), *with Jackson v. Estelle,* 570 F.2d 546, 547 (5th Cir. 1978) (no showing that State's ability to respond was prejudiced by delay). Accordingly, we affirm the district court's denial of the State's motion to dismiss.

The State's motion to dismiss this appeal, which was carried with the case, is denied.

1. *Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799 (1963).

2. *McMann v. Richardson,* 397 U.S. 759, 771 n.14, 90 S.Ct. 1441, 1449 n.14, 25 L.Ed.2d 763 (1970); *Lovett v. Florida,* 627 F.2d 706, 708 (5th Cir. 1980).

3. *Mempha v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); *Dozier v. U. S. District Court,* 656 F.2d 990, 992 (5th Cir. 1981).

face with a pillow. On September 23, in the presence of her three helplessly bound elderly sisters-in-law, petitioner murdered Mrs. Katrina Birk by stabbing her and shooting her in the head. Washington thereafter attacked the sisters-in-law with gun and knife, inflicting serious, permanent injuries. Finally, on September 29, Washington murdered Frank Meli, a twenty-year-old college student whom he had kidnapped two days before. While Meli was tied spread-eagled to a bed, Washington stabbed him 11 times. Although an accomplice had covered Meli's face with a pillow, petitioner stated he heard his victim repeat the Lord's Prayer "over and over" during the fatal attack. Thus, Washington's victims included black and white, young and old, male and female, all intentionally murdered in torturous ways.

Faced with this situation, Tunkey, relying on his experience in prior capital cases and his familiarity with the petitioner and the state trial judge, decided his client had but one chance to avoid the electric chair. Aware the judge normally responded favorably to a free, unqualified, unbargained for admission of guilt, Tunkey thought the only hope of leniency was for his client to show remorse and seek mercy.[4] Tunkey sought to establish remorse by introducing at sentencing Washington's testimony at the guilty pleas hearing.[5]

In sum, the record reveals that highly competent counsel made a reasoned, tactical decision as to how to get life instead of death for his client and followed through on that decision. We have consistently held that counsel will not be regarded constitutionally deficient merely because of tactical decisions. See *United States v. Guerra*, 628 F.2d 410 (5th Cir. 1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981); *Buckelew v. United States*, 575 F.2d 515 (5th Cir. 1978); *Williams v. Beto*, 354 F.2d 698 (5th Cir. 1965).[6] That the tactic failed is of no necessary consequence. Indeed, even if an attorney's strategy should appear clearly wrong in retrospect, constitutionally ineffective representation does not automatically result. *Baty v. Balkcom*, 661 F.2d 391, 395 n.8 (5th Cir. 1981); *Baldwin v. Blackburn*, 653 F.2d 942, 946 (5th Cir. 1981).

When a strategic choice of action makes unnecessary a certain line of investigation, it should not be necessary for effective counsel to pursue that investigation. See *Plant v. Wyrick*, 636 F.2d 188, 189–90 (8th Cir. 1980); *Ewing v. Williams*, 596 F.2d 391, 396 (9th Cir. 1979). We have held that counsel for a criminal defendant is not required to pursue every line of inquiry in a case until it bears fruit or until all conceivable hope withers. *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980). The Court's suggestion that the affidavits filed in this

4. Tunkey testified:

> To myself, I certainly thought if David had any chance at all, and I am really getting subjective, in front of this particular Judge, on these particular facts for these particular kind of crimes, that the one shot he perhaps had was the fact that he genuinely was coming before the Court and admitting his guilt, unlike some defendants who come in and plead guilty to avoid a harsher punishment.

Later in his testimony:

> Q. Do you think that Judge Fuller would have been concerned about a defendant's remorse?
>
> A. Oh, yes, I think that was all part and parcel of David's attitude in court and also to me out of court. That is why I had the strong feeling that this was the most important thing he had going for him.

5. On cross-examination, when questioned as to why he did not produce members of the family

whose affidavits were before the court in the habeas corpus proceeding, Tunkey said:

> [T]he remorse that was shown, I assume it would have been shown in jail since he was not any place but jail from the day of his arrest until the sentencing on the 6th of December.
>
> I also thought it would have been superfluous because the remorse that David exhibited to me in court was of sufficient quality and quantity that it was obvious, to me anyway, and I thought to the trial Judge, that it was completely sincere, that it was not something that was phonied up, if you will, to try to get a life sentence....

6. The Eleventh Circuit, in the en banc decision of *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), adopted as precedent the decisions of the former Fifth Circuit.

habeas corpus case show ineffective assistance of counsel because Tunkey's tactical decision was based on inadequate information establishes a disastrous principle for two reasons. First, that decision has been made on a record that does not suggest Tunkey would or should have taken a different approach had he been aware of the information in the affidavits. Second, there will probably never be a case where in retrospect some so-called "favorable" affidavits on points not investigated by counsel cannot be obtained after the fact.

Only if we sit "to second guess considered professional judgments with the benefit of 20/20 hindsight," contrary to the protestation of the Court's opinion, can it be argued Tunkey was ineffective.[7] Had he hit the mark, his tactic would have been brilliant. But the curious part of the Court's decision in this case, however, is that even with the benefit of 20/20 hindsight, there has been no showing on this record that anything else would have had any likelihood of working.

Although the Court rejects a test that would require a showing of some likelihood that another tactic would have been successful, it concedes *some* prejudice must be shown. *Davis v. Alabama,* 596 F.2d 1214 (5th Cir. 1979), *vacated as moot,* 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980). In this record there is an absolute void of evidence showing even the slightest possibility that anything Tunkey could have done would have saved his client from a death sentence. In my judgment, in the absence of some possibility that another course of action would have benefited his client, the record compels a finding that Washington's attorney was not constitutionally ineffective. A remand is a fruitless prolongation of already protracted litigation because had the district judge come to any other conclusion on this record, he would have been in error as a matter of fact and wrong as a matter of law.

I likewise dissent from the Court's striking down the Florida Supreme Court's standard for reviewing ineffective assistance of counsel claims set forth in *Knight v. State,* 394 So.2d 977 (Fla.1981), which followed *United States v. DeCoster,* 624 F.2d 196 (D.C.Cir.), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979). The district court should not be reversed for following the same standard.

The Court rejects the requirement that a habeas corpus petitioner must demonstrate prejudice "to the extent that there is a likelihood that the deficient conduct affected the outcome of the court proceedings." Instead, it says the petitioner must show "but for his counsel's ineffectiveness the sentencing phase, but not necessarily its outcome, would have been altered in a way helpful to him." The Court substitutes semantics and appellate theory for sound reasoning and the real life requirements of the courtroom. How can the sentencing phase of a capital case be altered in a way helpful to the defendant which would not have a likelihood of affecting the outcome of the proceeding?

The only task involved in representing a guilty, convicted capital criminal is keeping

---

7. That Tunkey was correct in his assessment of the sentencing judge is illustrated by the following excerpts from the guilty pleas hearing:

THE DEFENDANT: I would like to say this. I believe the crime fits the punishment and I don't want to die. You understand what I am saying, but I say if I got to sit up in some jail and rot I would rather get the chair.

THE COURT: We will resolve the question of punishment. *I want you to be satisfied that I have a great deal of respect for people who are willing to step forward and admit their responsibility.* That is not an automatic key to the door nor is it anything else.

\* \* \* \* \* \*

I am certainly satisfied you have been represented up to this point and will continue to be represented through Mr. Tunkey and I find him to be a very able and competent counsel and that that you have had ample opportunity to discuss this matter with him, and in fact, are entering pleas in this case that take away from him the opportunity of really being a lawyer that he would like to be for you.

But, *I respect you for that and I think it speaks in your favor.*

There certainly is a factual basis for the Court to accept your pleas in this case and on that basis I will do so.

(Emphasis added).

him out of the electric chair. I would think a truly competent trial attorney should do nothing, absolutely nothing, that would not have a "likelihood" of affecting the outcome of the proceeding. The test of *DeCoster* clearly satisfies the constitutional demands in this case and should be adopted, not rejected, by this Court.

That the Court is wrong in rejecting *DeCoster* is apparent for several reasons.

*First*, where the allegation is that qualified counsel's act or omission rendered him ineffective, prior cases in this Circuit probably require a showing of prejudice in relation to the outcome of the capital sentencing proceeding. *See Washington v. Watkins*, 655 F.2d 1346, 1362 (5th Cir. 1981); *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981); *Mendiola v. Estelle*, 635 F.2d 487, 491 (5th Cir. 1981); *Lovett v. Florida*, 627 F.2d at 709–10; *Buckelew v. United States*, 575 F.2d at 521; *United States v. Doran*, 564 F.2d 1176, 1178 (5th Cir.), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1977); *Pennington v. Beto*, 437 F.2d 1281, 1285 (5th Cir. 1971). Of course, these cases are different from those in which there was no counsel or counsel was completely blocked from action. *See, e.g., Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

*Second*, a state prisoner seeking a writ of habeas corpus from a Federal court on ineffective assistance of counsel grounds has the burden of proving facts that show he is being unconstitutionally detained. *United States v. Killian*, 639 F.2d 206, 210 (5th Cir. 1981). To require a showing of a "likelihood" that ineffective counsel contributed to that detention does not saddle him with an unsurmountable burden.

*Third*, the Court's concern that under the *DeCoster* test the Court would be required to "predict with some degree of accuracy what that fact finder would have done had it been presented with different evidence" is unjustified. The undertaking required by the *DeCoster* rule is indistinguishable from the courts' functions in a variety of other contexts. What does a trial court do when faced with a motion for new trial based on newly discovered evidence? What does this Court do when faced with garden variety harmless error arguments? Just as trained lawyers are able to make professional judgments as to what will or will not have a likelihood of benefitting a client, trained judges should be able to take the application of the *DeCoster* test out of the "highly speculative" range of activity the Court's opinion describes. Moreover, the Court has misstated the exercise, because reviewing courts need only decide whether different evidence would have a likelihood of affecting the outcome. They need not decide "what the fact finder would have done."

*Fourth*, the Court's opinion reflects that none of the other circuits have specifically rejected *DeCoster*, some have standards of review that are similar, and others seem to assume that where prejudice must be shown, it must run to the outcome of the proceeding about which the petitioner is complaining. Even the Sixth Circuit, described by the majority as perhaps the only circuit rejecting the prejudice requirement in its entirety, has of late retreated from its absolutist position. *See McKeldin v. Rose*, 631 F.2d 458, 460–61 (6th Cir. 1980), *cert. denied*, 450 U.S. 969, 101 S.Ct. 1488, 67 L.Ed.2d 619 (1981).

The other grounds for relief asserted in Washington's habeas corpus petition are insubstantial. Petitioner protests the district court's summary rejection of a number of grounds asserted in his petition. While it would have been better to address the grounds individually, I would not reverse on the basis of the form of the district court's opinion, particularly in light of the lack of substance of the claims disposed of summarily.

Finally, the Court's opinion addresses the fact that in the federal court evidentiary hearing, the state sentencing judge was permitted to testify as to the weight he accorded mitigating and aggravating fac-

tors in the case and as to whether the evidence Washington urges would have made a difference. I would not here decide the legal effect of the admission of that testimony. Although the district court made note of it, disregarding it does not make the contrary true, and the record is still insufficient to support a decision for the petitioner. The Court's opinion ably demonstrates the problems with such testimony. It should be noted, however, that in the particular setting of habeas corpus evidentiary hearings, courts have considered the testimony of trial judges. *See Haggard v. Alabama*, 550 F.2d 1019, 1022 (5th Cir. 1977); *Williams v. Beto*, 354 F.2d at 703; *United States v. Follette*, 410 F.2d 1276, 1278 (2d Cir. 1969). We have found no denial of an application for writ of habeas corpus reversed because of the admission of such testimony. Moreover, one can reasonably speculate that if the sentencing judge had given positive testimony that unpresented evidence or different tactics would have had a likelihood of affecting the sentence, this or any other reviewing court would be hard put to refuse to consider such testimony in a death case.

This record compels the decision that Washington was not deprived of constitutionally effective counsel. Even if some fault can be found in his counsel's conduct, there is no showing that a different strategy would have had any likelihood of affecting the sentence of the state court. I would affirm.

