UNITED STATES of America ex rel.
Roosevelt H. GREEN H-5734,
Appellant,

v.

Alfred T. RUNDLE, Superintendent.
No. 18418.

United States Court of Appeals,
Third Circuit.

Argued Oct. 8, 1970.

Decided Nov. 20, 1970.

Thomas Gibson, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellant.

Paul R. Michel, Asst. Dist. Atty., Philadelphia, Pa. (James D. Crawford, Deputy Dist. Atty. for Law, Chief, Appeals Div., Richard A. Sprague, First Asst. Dist. Atty., Arlen Specter, Dist. Atty., Philadelphia, Pa., on the brief), for appellee.

Before KALODNER, STALEY and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from the order of the District Court for the Eastern District of Pennsylvania, following an evidentiary hearing, which denied appellant's petition for a writ of habeas corpus. That petition sought relief from confinement resulting from appellant's conviction in the Philadelphia Quarter Sessions Court on charges of aggravated robbery and conspiracy. In the state criminal trial appellant's defense was alibi. With respect to that defense one of his habeas corpus contentions is relevant.[1] That contention is that he was denied the effective assistance of counsel because the trial attorney furnished by the Philadelphia Voluntary Defender's Association, confronted on the morning of trial with the absence of employment records which might have corroborated his alibi contention, decided not to ask for a continuance in order to subpoena either a witness or the records.

At the time of the evidentiary hearing in the district court the governing precedent was United States ex rel. Mathis v. Rundle, 394 F.2d 748 (3 Cir. 1968). This was so because although the Defender Association had been appointed at the time of appellant's arraignment, the actual trial attorney did not obtain the file until the eve of trial and did not see his client until the morning of trial. Relying on the *Mathis* presumption of prejudice arising from such circumstances, court appointed counsel at the habeas hearing established these facts, the absence of both the alibi witness and records, and little more. The Commonwealth, responding, offered the testimony of the trial attorney. It and the district court assumed that the conviction should be set aside only if the service of trial counsel was of such caliber as to amount to a farce or mockery of justice. See, e. g., United States ex rel. Carey v. Rundle, 409 F.2d 1210, 1213 (3 Cir. 1969); United States ex rel.

Darcy v. Handy, 203 F.2d 407, 427 (3 Cir. 1953). The Commonwealth did not call the alleged alibi witness or produce the employment records. The district court concluded that the services of counsel did not amount to a farce or mockery of justice and on this ground denied the writ.

Moore v. United States, 432 F.2d 730 (3 Cir. 1970), decided after the district court habeas corpus hearing but before the argument on this appeal, overruled United States ex rel. Mathis v. Rundle, *supra*, eliminating the presumption of prejudice. It also clarified the standard against which adequacy of representation is to be measured. For the "farce or mockery of justice" standard of United States ex rel. Carey v. Rundle, *supra*, and United States ex rel. Darcy v. Handy, *supra*, we substituted a test of normal competency. Thus both sides in the district court proceeded on assumptions as to their burden which in the light of *Moore* are invalid. Appellant's counsel, relying on the *Mathis* presumption, failed to show how trial counsel's actual performance prejudiced the alibi defense. The Commonwealth, relying on the mockery of justice standard, failed to explore whether what was neglected was in fact prejudicial. As we shall develop, the record leaves the question of prejudice unanswered.

An investigator for the Voluntary Defender's office interviewed appellant some two weeks before trial and learned about the alibi defense, which was that appellant was working elsewhere at the time of the offense. The report of the interview was placed in the file. Thereafter another investigator, Arthur, interviewed appellant's employer, Foust, and prepared a report. On the day before trial the trial attorney took the file home in the evening and reviewed it. From the file report of the initial interview he became aware of the alibi defense. Arthur's report of the interview with Foust was not in the file. The

---

1. We have reviewed appellant's other contentions and are satisfied that they were properly disposed of in the memorandum and order of the district court.

trial attorney realized more investigation would be needed, and marked on his review notes "cfn," meaning continue until further notice.

The next morning at the Defender's office the trial attorney obtained Arthur's report of the interview with Foust. With respect to that report he testified:

Q. What was the substance of Arthur's report?

A. The report was that he had interviewed the wife and received very little cooperation from her and he talked with his employer and his employer told him he had no way of checking the amount of days off in February and the only days that he could have off were the days that it rained or snowed and the Internal Revenue had his books.

Q. Did Mr. Arthur indicate whether or not he believed Mr. Foust?

A. No. He said, "I really don't believe his Charles Foust, employer."

There is nothing in the record from which we can infer whether the investigator's skepticism about Charles Foust referred to Foust's statement as to the location of the books, or referred to Foust's claimed inability to determine on what days appellant worked.

The trial attorney, having read Arthur's report, visited appellant at the cell room in City Hall. With respect to that interview he testified:

Q. Now what discussion did you have with Mr. Green prior to trial, if any, concerning the alibi witness and the report which you have just summarized?

A. Contrary to Mr. Green's statement, I saw him in the cell room prior to trial, which was my practice to go over to the cell room and talk with the defendants before they were brought down to the court room because they usually weren't brought down to the court room until

sometime between 9:30 and 10 and you wouldn't have ample time to interview them.

Q. About what time would your cell room interview of Mr. Green have taken place?

A. 9 or between 9 and 9:15, every morning, and at that time I apprised Mr. Green of the results of our investigation and I was prepared to continue the case before that until I got the report.

I don't know what his reaction was, but whatever it was indicated to me that at that time it didn't matter and he was withdrawing in some way his demand for their presence.

Q. So then when the trial was about to begin you did not request a continuance?

A. No, I did not.

The above testimony was in the Commonwealth's case. On cross examination the trial attorney elaborated with respect to this interview with appellant.

Q. Did you ask him whether there were payroll books?

A. He had told us that his boss might have a record of whether or not he had worked, especially if this was a rainy day.

Q. Mr. Brereton, my question was did you tell Mr. Green anything about payroll books?

A. Payroll books? No, I don't think I told him anything about payroll books. I more than likely told him that the records that would indicate whether or not he was working were at the Internal Revenue and that his employer said that he would have no way of checking the amount of the days off in February.

Later on cross examination he was asked:

Q. Mr. Brereton, would you explain for the record why, when you hadn't had any opportunity to look at Mr. Foust's books or

know what they contained, you did not ask the trial court to grant a continuance of the trial to afford you an opportunity to go and see whatever was in these books?

A. As I recall it, it was based upon the reaction of Mr. Green to my confronting him with the investigator's report and as best I can recall it his reaction was that to continue to press it would be fruitless anyway, so let's go on.

Q. Did Mr. Green offer you any reason why he thought it would be fruitless to continue to press it?

A. His demeanor and attitude. He didn't say "Well, I want it, I want them here anyway," or anything of that nature.

He says he sort of shrugged it off and indicated to me that, well, it's best not to pursue it any further, let's get on.

Q. In other words, you made the decision gauging his demeanor and attitude and not from anything he told you?

A. Well, I don't know. He may have said something to me. I can't recall.

■ Faced with the gap in information respecting the alibi, the trial attorney might have done several things. He could have verified from his client that there were no payroll records, or that they would not be helpful. As the quoted testimony shows, the client did not so indicate. He might also have made a further investigation of or issued a subpoena duces tecum for the payroll records. He did neither. Nor did he explain to his client the availability of a subpoena duces tecum. The employer was required by law to keep records of hours of employment. Fair Labor Standards Act, 29 U.S.C. § 211(c) (1964); Minimum Wage Act of 1961, 43 P.S. § 333.14 (1964). A normally competent attorney should know that such records, kept in the ordinary course of business by a disinterested third party,

would be highly corroborative of his client's alibi testimony. This attorney allowed his client, who would not be expected to be so knowledgeable, to proceed to trial that morning without the records and without having investigated their contents. The testimony discloses that at the time of the state conviction trial attorneys for the Voluntary Defender Association were carrying a caseload of from 600 to 800 cases a year, and often handled 40 to 50 cases a day. This might explain but would not mitigate a critical departure from the standard of normal competence. We must therefore remand to the district court for a determination whether in all the circumstances of the case the attorney's conduct with respect to the alibi witness or records fell below that standard.

■■ The inquiry cannot stop here, however. In many instances ineffective assistance of counsel may have had so pervasive an effect on the process of guilt determination that it is impossible to determine accurately the presence or absence of prejudice. In other cases changes in circumstances since the original proceedings beyond petitioners' control, such as the death of a witness who was not called, may make it impossible at the time of the habeas corpus petition to determine prejudice. In such instances a finding of departure from the standard of normal competence requires without more, a new trial. In other cases the failure of counsel may be with respect to a narrow issue or area, and it may well be possible, in the habeas corpus proceeding, to determine whether or not the departure from normal competence was prejudicial. This is such a case, for if the payroll records do not support appellant's alibi their absence did not prejudice him, and may even have helped him. When a habeas corpus petitioner alleges as a ground for relief the failure of counsel to exercise normal competence in presenting specific trial evidence it is reasonable, we think, to put on petitioner the burden of showing that the missing evidence would be helpful.

In this case appellant's counsel, in reasonable reliance on the *Mathis* presumption, made no effort to establish that the missing records would have corroborated the alibi. The Commonwealth could have overcome the *Mathis* presumption by showing that the records would not have been corroborative. It did not do so, but on the present record we are unable to say whether that failure was because of what the records, if there are any, contained, or because of a belief that such proof was unnecessary under the "mockery of justice" standard. Moore v. United States, *supra*, eliminated both the *Mathis* presumption and the mockery of justice standard. Thus the case must be remanded to the district court for a hearing at which appellant shall have the opportunity of developing, by the testimony of his employer or by production of the payroll records, that his alibi could in fact have been corroborated. In the absence of such a showing the writ should be denied.

The order of the district court denying a writ of habeas corpus will be vacated and the cause will be remanded for further proceedings consistent with this opinion.