**Julius C. TAYLOR, Petitioner,**

v.

**Gary J. HILTON, Superintendent, New Jersey State Prison, et al., Respondents.**

**Civ. A. No. 81–1360.**

United States District Court,
D. New Jersey.

Oct. 28, 1982.

Order Nov. 16, 1982.

---

.. 

914

William M. Kunstler, New York City, and Stuart S. Ball, Newark, N.J., for petitioner.

John B. Mariano, Camden County Prosecutor by Jack L. Weinberg, Asst. Prosecutor, Camden, N.J., for respondents.

BROTMAN, District Judge.

This is an action for a writ of habeas corpus, 28 U.S.C. § 2254, currently before the court on petitioner's motion for reargument. In an opinion and order filed March 29, 1982, we granted respondents' motion for summary judgment and dismissed the petition. On May 21, 1982, we permitted petitioner to present reargument on the motion. Petitioner has confined his reargument to the issue of ineffective assistance of counsel. *See* our prior opinion at 4–5.

The central argument made by petitioner is that the court incorrectly deferred to the state trial court's legal conclusions, rather than independently applying the federal standard for competency of counsel to the factual findings of the state court. In this respect we agree with petitioner. In assessing the claim of ineffective assistance, we stated that the state court's finding that petitioner's trial attorney was competent was "fairly supported by the evidence," and we declined to disturb it. On reconsideration, we believe that we misapplied § 2254(d)(8) to the state court's "finding" of effective assistance. Effective assistance of counsel presents a mixed question of law and fact. *Davis v. Heyd,* 479 F.2d 446, 450 (5th Cir.1973). "[T]he 'factual' determinations made by state ... courts which federal courts must presume to be correct do not include mixed questions of fact and law." *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 318, 83 S.Ct. 745, 755 n. 6, 759, 9 L.Ed.2d 770 (1963); *Mason v. Balcom,* 531 F.2d 717, 721 (5th Cir.1976). Thus the court is required to defer to the *factual* findings of the state trial court, but must also determine anew whether the federal legal standard for effective assistance of counsel has been satisfied. *Eldridge v. Atkins,* 665 F.2d 228 (8th Cir.1981).

Although petitioner's trial attorney is alleged to have inadequately represented petitioner throughout his criminal trial, this petition focuses only on his allegedly inadequate investigation and preparation for trial. We have stated in our prior opinion the facts of the crime for which petitioner was convicted. Further details are important for purposes of the instant motion. The trial attorney's actions and explanations are set forth in the transcript of the hearing held June 20 and 22, 1977 (Respondents' Appendix 10, hereinafter referred to as HT–1 or HT–2), and in the opinion of the state trial court rendered July 14, 1977 (Respondents' Appendix 15, attachment marked "PA2"). Drawing on this record and the transcript of petitioner's trial (Respondents' Appendix 2, hereinafter referred to as T), the following are the facts relevant to petitioner's claim of ineffective assistance of counsel.

The crime took place on December 4, 1974, at the premises of a vending machine business establishment on Route 130 in Pennsauken, New Jersey. There were five eyewitnesses, three of whom saw all three of the criminals. These three witnesses were Patrick Caridy, Mildred Caputi, and "J.D.". The other two, Jimmy D'Alessandro and John Wagner, saw only one of the three robbers. (T at 423–25, 433).

Caridy, Caputi and "J.D." testified that three armed men arrived at 10:25–10:35 A.M. Caridy and Caputi were tied up, while "J.D." was instructed to show the robbers around the building. One man took "J.D." into the bathroom and raped her. Afterwards, she was tied next to the other victims. The rapist left the scene at about 10:50 A.M. in a vehicle which none of the victims saw. The other two men loaded stolen coins and cigarettes into a van owned by the business, and left in the van approximately ten minutes later.

After the men left, the victims untied themselves and telephoned the police. The call was received at 11:08 A.M. After the police arrived, Caridy, Caputi and "J.D." gave the following description of the rapist—black male, 5′ 8″, moustache, glasses, short straight hair, brown leather jacket, brown and black shoes, check pants. (T at 268).

The petitioner, Julius Taylor, was stopped for speeding by Trooper Gary Stowell on the Atlantic City Expressway at a point approximately eighteen to twenty miles from the scene of the crime, a twenty to twenty-five minute drive. He had been traveling east (that is, away from Route 130), and made a U-turn to travel west. Although Trooper Stowell's summonses and incident report gave the time as "11:00 a.m.," he testified that the time was actually 11:10 to 11:20 A.M., but that he routinely rounded off the time to the last half hour. Petitioner was wearing green sunglasses, a black leather jacket, predominantly red plaid pants, and brown shoes. He is black, 5′ 8″, and at the time wore a very thin moustache.

Petitioner got out of his car. The trooper frisked him and asked for his license and registration. He instructed petitioner to stand at the front of the car and checked inside the glove compartment, but did not find the papers. He noticed marijuana residue in the ashtray. (T at 31–33). Trooper Stowell then searched the trunk of the vehicle and found a shotgun. Petitioner was arrested for weapons offenses, searched, handcuffed, and placed in the police car. (T at 34–35). The trooper thoroughly searched the rest of the vehicle and found a handgun and a small knife. A second officer arrived thereafter (T at 38, 54), and other officers arrived later as well. (T at 55). At one point, Stowell heard a radio broadcast reporting the robbery and giving descriptions of the three perpetrators. He responded to the broadcast, stating that he had a suspect matching the description. The reply, from a civilian dispatcher at Mantua State Police Barracks, stated that the time element was not correct. (T at 47). Petitioner said to Trooper Stowell that he was not the suspect since his jacket was brown. He then said something like "Why don't you search my dick?" This statement was admitted as a voluntary incriminating statement at trial. The trooper also testified that petitioner

said, "Who would try to steal so much in coin?" It was the trooper's testimony that the broadcast he heard had not mentioned "coin," nor had it reported a rape, and that these statements disclosed petitioner's peculiar knowledge of the crime. Petitioner asserts that he was sitting in the police car during the searches, and heard a broadcast reporting the robbery and rape, which prompted his statement about checking his penis. He denies that he said "in coin."

At some point during the stop, Trooper Stowell radioed for a tow truck. A report received by the two truck dispatcher showed the time of receiving the call as 11:19 A.M.; however, this evidence was not introduced at trial. Instead, it was uncovered by an investigator preparing for the competency hearing. Stowell testified that he "cleared the scene" of the arrest some time after noon. (T at 52).

Petitioner was taken to Hammonton State Police Barracks. Stowell called the Pennsauken police and they discussed arranging a lineup at the Gloucester Township station. Stowell then took petitioner to Gloucester Township Police station for arraignment. When they arrived, "J.D." and her fiance, "L.S.", among others, were waiting in a hallway area. "J.D." was able to observe the suspect in the hallway because the station did not have lineup facilities. She viewed him for about a half hour, but she did not positively identify him. She mentioned that the rapist's undershorts were blue. A detective checked petitioner's undershorts, which were bright red. At the trial, the victim and police officers explained this discrepancy by positing that what she thought were blue undershorts had actually been the shirttail of his blue shirt, tucked into his pants. Petitioner maintained, as stated earlier, that his shirt on the day of arrest was red. (T at 585–86).

The police continued to investigate the crime. Two days later, on December 6, 1974, Patrick Caridy and "J.D." were shown a photographic display; both identified petitioner. John Wagner did not identify him, but did select another person, who could not have been involved. (T at 499).

Twelve days after the crime, on December 16, a lineup was conducted, and Caridy and "J.D." identified petitioner. They also identified him at trial. The other witnesses were unable to identify anyone at the lineup or at trial.

Petitioner asserts his innocence and believes he is the victim of misidentification. He testified that on the morning of December 4, 1974, he did the following. At approximately 9:20–9:30 A.M., he withdrew $200.00 in cash from Fidelity Bank in Philadelphia. Afterwards, he went to a nearby shop and purchased a chess set. He then drove to see a friend, Ali Ahmad, who lived in Elm, New Jersey, to play chess. He brought a shotgun and hunting gear in order to do some hunting at his friend's. He had recently purchased the handgun, and brought it to shoot at a target at Ahmad's. He crossed the Walt Whitman Bridge into New Jersey shortly before 10:00 A.M. On the way to Ahmad's, he mistakenly took a wrong exit onto the expressway. He made a U-turn and was pulled over by Trooper Stowell at approximately 10:35–10:40 A.M. Ahmad testified at trial that he was expecting petitioner to come over to play chess that day. He did not plan to go hunting with petitioner, he testified, but did have a target and had extended an "open invitation" to petitioner to hunt on adjacent property owned by his cousin.

Within days of his arrest, petitioner retained his trial attorney. (HT–1 at 95–96). The six-day trial was conducted from June 9 through June 17, 1975. To review what actions trial counsel undertook during the intervening period, we must turn to the findings and conclusions of the state trial court, rendered after the hearing on petitioner's appellate claim of ineffective assistance of counsel. (Respondents' Appendix 15, "PA2").

The state trial court's opinion, while it does not include very detailed findings, credits the testimony of each of the hearing witnesses as true and sincere. (*Id.* at 2). As to adequacy of trial counsel's preparation, the trial court stated that counsel "gave his answers [to the charge of inade-

quacy] in his prepared statement." (*Id.* at 5). This statement was read into the record by petitioner's trial attorney. (HT–1 at 58–93). Thus, the state court accepted the trial attorney's testimony as reflecting the facts. In characterizing the testimony, the state trial court said, "This Court has determined and finds as a fact that [the trial attorney] did much by way of preparation and investigation." (Respondents' Appendix 15, "PA2" at 8).

His investigation and preparation consisted of the following. He received discovery from the state in April, 1975. (HT–2 at 4). He reviewed the materials and developed his cross-examination by identifying and indexing inconsistencies in the witnesses' statements, grand jury testimony and police records. (HT–1 at 89). The transcript of the cross-examinations of the government witnesses indicates his familiarity with the discovery materials. He visited petitioner in jail three times during the pretrial period, and spoke with him on the telephone "many times." (HT–1 at 82–83). To prepare petitioner for testimony and cross-examination, he spoke with him in the courtroom prior to and following the trial proceedings each day, and during recesses. (HT–1 at 83; HT–2 at 53). He spoke with the only other fact witness he called for the defense, Ali Ahmad, in the hall of the courthouse during trial for the first time. (HT–2 at 53–54). He stated he had tried to reach Ahmad before trial but was unsuccessful. (HT–1 at 81). He interviewed only a couple of witnesses. He spoke to one of the crime victims, either Wagner or D'Alessandro, to ascertain if he could identify petitioner. He also spoke to one of the Pennsauken police officers, either Hall or Morris, to determine if any tapes or logs were still in existence. Although it is unclear from the transcript, this was apparently done just prior to or at the time of trial. (HT–2 at 7–11). With respect to the two or three witnesses to whom he spoke, he talked with them on the telephone and made no notes regarding the conversations. (HT–2 at 7–11). He explained his failure to contact any other witnesses or the numerous witnesses named in the discovery materials by stating that he "knew what every witness was going to say." (HT–1 at 81).

He admitted that his investigation and preparation did not include any of the following. He did not attempt to have scientific tests conducted on a towel and vaginal smear which contained the rapist's semen. Blood typing tests from semen samples can exclude a suspect if his blood type is inconsistent with the sample, but cannot identify any specific individual. (HT–2 at 125–28). Trial counsel, although seemingly familiar with such tests, did not seek this information because he mistakenly believed that the test could not be made on semen from black men. (HT–1 at 76–77; HT–2 at 128). With respect to this issue, the state court inferred from the hearing that the sample was probably not conducive to testing and thus, trial counsel's error was not crucial. (Respondents' Appendix "RA2" at 2).

Petitioner's attorney did not seek witnesses to corroborate petitioner's version of what occurred the morning of the day of the crime. For example, he never checked the shop in Philadelphia to see if a salesperson remembered petitioner or to see if any record of the sales transaction existed. (HT–2 at 55–57). He did not check the bank to identify similar witnesses until the eve of the trial, when he attempted to obtain a bank witness for the purpose of authenticating a bank receipt which petitioner provided him. Moreover, he did not interview any of the state witnesses except for the two or three mentioned above, nor did he independently seek out other possible witnesses. (HT–1 at 73; HT–2 at 7–11).

The alibi statement, ordinarily submitted prior to trial, was not prepared by counsel until after he had given his opening remarks and only then after the court requested it. (T at 172–77). He testified that he had informed the prosecutor's office "verbally" several months before trial and simply reduced it to writing at the time of trial. (HT–1 at 80). However, his failure to timely and carefully draft the statement resulted in an incomplete job; the alibi statement omitted petitioner's claim that he planned to go target shooting. Further-

more, the late preparation of the statement allowed the prosecutor to imply that a recent fabrication had taken place. (T at 593–95).

Finally, although the time of arrest was perhaps the most critical fact in the case, petitioner's attorney did not attempt to secure evidence which might have confirmed that the arrest took place earlier than 11:20 A.M., contrary to Trooper Stowell's testimony. First, he did not *promptly* attempt to obtain or preserve from destruction tapes or logs of radio transmissions of the various police organizations. The tapes are correlated to the exact time of broadcast. (T at 55). At the time of trial he did seek to subpoena these tapes only to learn that any records which did exist had been destroyed thirty to sixty days after the date of the arrest. (T. at 127, 169–70; HT–1 at 61–62, 72–73, 115). Second, he did not locate the tow truck operator who had been called to the scene of arrest at 11:19 A.M. The operator and towing records were located by the public defender's investigator for the competency hearing. (HT–1 at 62). Since Trooper Stowell testified that he had searched the car prior to taking petitioner into custody, this would have placed the time of arrest earlier than 11:19 A.M. In fact, Stowell estimated that fifteen to twenty minutes elapsed before he heard the broadcast. (T at 53). Third, trial counsel did not seek to obtain other records of stops or arrests by Trooper Stowell, which would have contradicted his testimony about his "routine practice" of rounding off 11:20 to 11:00. (HT–1 at 64–65). Such summonses were obtained by the public defender's investigator, showing times other than the hour and half hour. Counsel explained that the testimony about rounding off was sufficiently incredible on its face, and therefore, he did not need hard evidence to contradict the officer's testimony. (HT–1 at 65). Although he testified that he thought the records might have corroborated Stowell and therefore had a risk of backfiring, he admitted that there were other means of obtaining these records without running such a risk, as was done by the defender's investigator. (HT–2 at 66).

We now turn to the legal standard that must be applied in order to determine if petitioner was deprived of effective assistance of counsel. The courts have set forth a two-step test which petitioner must prove in order to make out a constitutional case of ineffective counsel. The first requirement was described by the Third Circuit in *Moore v. United States,* 432 F.2d 730 (3rd Cir. 1970). The court in *Moore* held that an attorney must exercise "the customary skill and knowledge which normally prevails at the time and place." *Id.* at 736. It further emphasized that the right to counsel is not a guarantee of perfection; what is required is "normal and not exceptional representation." *Id.* at 737. The second step was discussed in *United States v. Baynes,* 687 F.2d 659 (3rd Cir.1982) [*Baynes II*]. The court in that case decided that once petitioner proved his claim of ineffective counsel the court must then determine "whether defendant suffered prejudice as a result of his attorney's constitutional negligence." *Baynes II* at 669.

■ This court has historically recognized the difficulty of reviewing an attorney's work after the trial has been completed. As a result, we have been extremely careful when analyzing Sixth Amendment complaints alleging ineffective counsel. The requirement of "normal representation" set forth in *Moore,* however, is a more exacting standard than the former test used in this circuit which required proof that the representation was "so lacking in competency or good faith that ... defendant would be practically without representation and it would therefore be a farce and a mockery of justice." *United States ex rel. Darcy v. Handy,* 203 F.2d 407, 427 (3rd Cir.1953). While we would not consider a mere mistake in judgment or failure to act in a particular manner as grounds for a constitutional violation, we do recognize that a failure to adequately investigate a case and prepare a defense may constitute ineffective assistance of counsel. *United States v. Baynes,* 622 F.2d 66 (3rd Cir.1980) [*Baynes I*] (It is the attorney's "ethical obligation to conduct a prompt investiga-

tion of the circumstances of the case and explore all avenues leading to facts relevant to guilt and to a degree of guilt or penalty." A.B.A. Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, § 4.1 (10th draft 1970)).

The court in *Moore* was faced with a habeas claim in which petitioner contended that his court-appointed counsel had been appointed too late. The lawyer, therefore, was allegedly unable to conduct an investigation and prepare for trial. More specifically, the court criticized counsel for failing to make any effort to determine the validity of petitioner's exculpatory claims or to interview the government witnesses prior to trial. Noting that the trial judge had commended the attorney for his courtroom performance, the court recognized that "the exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance." *Moore, supra* at 739.

In *Baynes II, supra,* the Third Circuit clarified the *Moore* standard with respect to an attorney's responsibility to conduct an adequate pretrial investigation. The petitioner in *Baynes II,* Gregory Trice, was one of seven co-defendants who had been convicted for a conspiracy to distribute and possess heroin. *Baynes II, supra* at 662. Although "substantial evidence" was proffered at trial against the co-defendants, Trice was convicted primarily on the basis of "an electronically intercepted telephone conversation of merely twelve words allegedly involving Trice and implicating him in the drug ring." *Id.* at 662. Prior to the trial, the government had obtained a voice exemplar from Trice which was also never introduced into evidence. During his habeas appeals petitioner contended that his lawyer failed to even listen to the exemplar despite his insistence that the voice on the telephone was not his voice. The attorney refused to listen to it, claiming that he "didn't know what it would say and if it were close, as a trial tactic [it] would have been stupid." *Baynes II* at 663, quoting

from *Baynes I,* 622 F.2d at 48. The court concluded that it would not question the lawyer's trial strategy; yet there was still no excuse for failing to even listen to the exemplar and in that way arrive at a more informed decision. *Baynes II, supra* at 666–667. As a result, counsel did not conduct an adequate investigation and petitioner was thereby deprived of effective assistance of counsel.

■ The situation in our case is analogous. At the evidentiary hearing, petitioner's defense attorney justified most of his actions (or inaction) by referring to them as trial tactics. The state court accepted these explanations and therefore ruled against petitioner. We do not take issue with the state court's findings in that regard; however, according to *Baynes II* we must delve further in order to determine whether counsel was constitutionally negligent. Our inquiry must not focus on defense counsel's strategic judgment, but rather on whether counsel investigated the relevant evidence in a manner sufficient to allow him to arrive at rational and informed decisions. In the instant proceeding, the attorney should have at least made some effort to investigate and confirm his client's story. Only after conducting an investigation would he be in a position to determine whether such evidence would be damaging at trial.

Throughout the competency hearing, the defense attorney claimed that his failure to conduct an independent investigation was due to his professed belief in his client's story. (HT–2 at 55, 57). While counsel's trust is admirable, it is irrelevant with respect to his duty as an advocate. As such, he must present to a jury the most believable set of facts he can produce. In this instance the attorney failed to validate petitioner's story concerning his activity prior to the arrest. To do so would have simply required corroborating certain facts with people in the store where petitioner allegedly purchased the chess set or to clock the distance and time it would take to go from the bank to the Atlantic City Expressway. An investigation into these matters may

have also led him to some witnesses who could possibly have corroborated petitioner's version of the facts.

Similarly, defense counsel's interviews with key state witnesses or potential defense witnesses were inexplicably brief and often nonexistent. (HT–2 at 5–10). At the evidentiary hearing he claimed it was unnecessary to talk with "J.D.", the rape victim who first identified the petitioner, and Patrick Caridy, another key government witness who also made an identification. In fact, the identification procedure itself was questionable since the victim, "J.D.", first saw the defendant in the police station following his arrest and would not identify him as the rapist. Two days later she picked him out of a photographic display. Obviously this identification was devastating to petitioner at trial, yet his attorney never challenged the procedure.

Finally, and for the purposes of this court's review, most importantly, counsel failed to thoroughly investigate the events surrounding petitioner's arrest. In this case very little was done in the days, and even months, following petitioner's arrest. The attorney neglected to obtain the police radio transmission tapes which he knew could be destroyed at any time and were essential to petitioner's case. Not only could these tapes have pinpointed the exact time of petitioner's arrest, a fact critical to the defense, they also may have negated the detrimental effect of petitioner's incriminating statements at the time of his arrest. Along the same line, counsel's failure to test the available sperm sample (which had to be done as quickly as possible) was inexcusable. The reason he offered for his inaction, that he did not think the sperm test would work on black men, defies belief. The test, if successful, could have worked to the petitioner's advantage; if unsuccessful, it would have been inadmissible.

The state argues that neither of these avenues of investigation would have necessarily helped petitioner's case. This is not a relevant factor prior to conducting investigation since it is the attorney's job to investigate. Only after obtaining all the results, should counsel determine if such evidence will be useful at trial. In this case the attorney never completed the investigative stage. He had no way of knowing whether any of the unobtained pieces of evidence would have been useful in helping to prove his client's innocence. For these reasons we conclude that petitioner's attorney failed to conduct an adequate investigation. *See Baynes II, supra.*

After demonstrating that counsel was ineffective, petitioner must show that his attorney's negligence was prejudicial. *See United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982); *United States ex rel. Johnson v. Johnson,* 531 F.2d 169, 177–78 (3rd Cir.1975), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). Respondents maintain that petitioner cannot show prejudice since any damage caused by the attorney's failure to investigate is purely speculative. The court in *United States ex rel. Green v. Rundle,* 434 F.2d 1112 (3rd Cir.1970) addressed just that issue, concluding that "in many instances ineffective assistance of counsel may have had such a pervasive effect on the process of guilt determination that it is impossible to determine accurately the presence or absence of prejudice." 434 F.2d at 1115. For this reason, it is the responsibility of the government to prove beyond a reasonable doubt that no prejudice resulted from counsel's failure to investigate. *Baynes II, supra* at 670–671; *see also Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In the situation we are faced with, none of the evidence heretofore discussed was available at trial due to counsel's failure to investigate. Obviously, it is not available for examination now since most of the evidence has either been destroyed or forgotten over time. According to the court in *Baynes II,* however, "all we need to determine is that [petitioner's] defense was prejudiced by his counsel's ineffectiveness—*i.e.,* that the ... evidence, if investigated, might have led to a viable defense and a [favorable] verdict." *Baynes II,* at 673, quoting from 622 F.2d at 69.

Based on the facts with which we have been presented, it seems clear that a more thorough investigation could easily have produced evidence which might have led to petitioner's acquittal. The police report tapes, for example, may have placed the time of petitioner's arrest at 11:00 A.M. If that was the case, it would have been almost impossible for him to have committed a crime twenty miles away. Counsel's failure to test the available sperm sample is another example of an act which, if completed and successful, may have proved that petitioner did not commit the rape. Respondents' argument that the sperm cells were probably useless by the time counsel was retained, is not relevant to our decision. Since no attempt was made to test the sperm, the state cannot prove that such an attempt would have actually been fruitless. In the absence of such proof, we cannot dismiss these errors as *de minimis* mistakes. *See Baynes II, supra.*

We want to emphasize, once again, that this court recognizes the inherent difficulty in assessing an attorney's performance after the trial. In this case, however, we cannot ignore the fact that petitioner did not have the benefit of adequate representation as contemplated by the Sixth Amendment. We, therefore vacate our order of March 29, 1982, and deny respondents' motion for summary judgment. Moreover, as a result of the constitutional violation, we must grant petitioner's writ of habeas corpus and direct the state court to hold a new trial, if possible, within a reasonable time.

### ORDER

To protect the identity of the rape victim, it is on this 16th day of November, 1982, hereby ORDERED that all references in this court's opinion of October 28, 1982, to her name and that of her fiance shall be deleted and in their place and stead the following substituted:

"J.D." (rape victim)

"L.S." (her fiance)

The clerk shall make the necessary changes in the opinion filed on that date.